[No. 27305. Department One. April 13, 1939.]

WILLIAM A. VAN COURT et al., Respondents, v. LODGE CAB COMPANY et al., Appellants.[1]

[1]Reported in 89 P. (2d) 206.

*J. Speed Smith* and *Henry Elliott, Jr.,* for appellants.
*John J. Sullivan* and *Carl Pruzan,* for respondents.

STEINERT, J.—Plaintiffs brought suit to recover damages for injuries sustained by them while riding in a taxicab owned by defendant Lodge Cab Co., Inc. Aetna Casualty & Surety Company was made a party defendant for the reason that it was surety upon the bond executed by the cab company in accordance with Rem. Rev. Stat., Vol. 7A, § 6383 [P. C. § 236]. Trial by the court, without a jury, resulted in findings, conclusions, and judgment in favor of plaintiffs. Defendants have appealed.

Appellants make two contentions: (1) That, under the evidence, the trial court should have found, as a matter of fact and of law, that, at the time of the accident, the taxicab was not being operated in the course of the owner's business; and (2) that respondents were guilty of contributory negligence. Upon these questions, the evidence consisted solely of the testimony given by respondents and by one of the owners of the cab company. In order to present a clear and complete picture of the case, it will be necessary to set forth the material testimony of respondents pertinent to the legal relation between themselves and appellant cab company at the time of the accident.

At about ten o'clock in the morning, on March 26, 1937, respondents, husband and wife, were standing on the sidewalk near the corner of Twelfth avenue and Main street, in the city of Seattle. A taxicab approached, driven by a negro, who was accompanied by a white man sitting beside him. What then occurred

will be stated in respondents' own words. On direct examination, Van Court testified as follows:

"A. He drove up there and asked where they could get any liquor, and I told them the liquor store was the only place I knew of. Q. Who was in the taxicab? A. There was the driver—the feller with the cap on—the colored feller. Q. Was there another man in the car at the same time? A. Yes, sir; a white feller. Q. Where was he sitting? A. Beside the driver, in the front seat. Q. Did he have a taxicab driver's cap or uniform on? A. No, sir; he didn't have no cap; he was dressed plain. The feller driving had the taxicab uniform—had a cap—that was the only uniform there was about it. Q. What did you say when he asked about liquor? A. I told him the liquor store was the only place I knew to get any liquor. And he said he didn't have no liquor permit, and I told him I had one, and I was going that way, if they would drive me by there I would do it, and he said 'It costs money to ride in my taxicab.' Q. Who said that? A. This feller that was driving. Q. The colored man? A. Yes, sir. The colored feller. And I told him I would give him fifty cents if they would take me by the liquor store and take me home, and he turned to the white feller and asked the white feller if that was okeh, and he said 'yes, sure, that is all right.' And we come down to Jackson. The colored feller said that 'If you will let me have the permit I'll get some myself. I'll go and get it,' and I handed it to him, and he went in to get the liquor, and they turned him down on the signature, and so he had told me—I had give him money out of my pocket to pay for me a pint of liquor, and he said 'They turned me down, because that wasn't my signature on that,' and he said 'You will have to go and get it,' he said 'It's all paid for.' And I went in and the man said he hadn't paid for it, but he bawled me out for letting him have my liquor permit, and he give me the liquor permit back, and he wouldn't sell me no liquor, and we come down to Second and James, and I went in and got the pint of booze myself, and the feller that was in the cab, he never said nothing about buying any, and

never offered to give me any money to buy any, and I bought the pint for myself and went home."

and, on cross-examination:

"Q. And you were going also to lend him your liquor permit to get him some liquor? A. Yes, sir. Q. And you did that? A. Yes, sir."

Mrs. Van Court testified as follows:

"Q. Calling your attention to March 26, 1937, the day of the accident, will you tell us in your own way what happened from the time you and your husband first saw the taxicab and its occupants? A. Well, he drove up by the side of us standing on the corner, and asked my husband if he knew where he could get some liquor, and my husband said at the liquor store, and he had his permit, and he said—we said 'We are going home', and he said 'You know this is a taxicab; you will have to pay.' Q. Who said that? A. That colored feller. Q. Where was he seated in the taxicab? A. He was driving, in the front seat. Q. Did he have the driver's cap on? A. Yes, sir. Q. Proceed. A. And then my husband paid him, and he asked if he would take him to the liquor store, and he went by the liquor store, and so he went in to get the liquor. I don't remember—I guess he wouldn't let him have it."

It appears that the Van Courts, at all times during their association and companionship with these two men, thought that the negro, whose name was Barnett, was the regular driver of the taxicab, and that the other man, whose name was White, was a passenger.

After the liquor had been purchased, the party of four went, in the taxicab driven by the negro, to respondents' home, located at 815 Eighth avenue. What occurred there will, likewise, be stated in the language of respondents. Van Court testified on direct examination, as follows:

"A. We went home, and when we got home this white feller wanted me—he said 'Would you give a feller a drink of that?' And I said 'Sure; if you want

a drink come on up; I'll give you a drink.' And he come on up with me, you see, and the taxicab driver, he got out and come up also. Q. Did he ask for a drink? A. No. He didn't ask for no drink at all. He didn't say nothing about a drink. And I went in and I taken a drink myself, and I went to the bathroom, and when I come back in the meantime there was a couple other fellers, friends of mine, had dropped in, and when I come back the pint of liquor was gone, and then when this couple of friends come in they said 'Van, I'll pay this feller, this taxicab feller, if you'll go down and get another bottle and come back.' "

and on cross-examination, as follows:

"Q. And you went up to your house and you all went in to drink? Did you live upstairs? A. Yes, sir. Q. You went up some steps? A. Yes, sir. Q. And you opened the bottle and you all took a drink? A. Yes, sir. That is, I taken a drink, and I went to the bathroom. Q. You went to the bathroom; you didn't see the others take a drink? A. No, sir; I didn't. I just seen them have the bottle. Q. How many drinks did you take? A. One. Q. How much of a drink was it? A. An ordinary drink. Q. How much would that be? A. That depends on how much whiskey there was. I have seen the time I could drink a pint and it wouldn't be much more than a drink for me. Q. And in this case— A. I was a little bit liberal. I wanted to give them all a chance to get a drink. . . . Q. And when you got up to your house and that liquor was consumed, whoever drank it, you decided you wanted some more liquor? A. Some people come in. Q. In the meantime you decided you wanted liquor? A. They was the ones wanted it. Q. You were going to take the taxicab and go down to the liquor store and get more liquor? A. Yes, sir."

Mrs. Van Court gave her version of the affair at the house as follows:

"Q. You don't know what happened inside? A. No, sir. I didn't pay much attention to that. And he come back out then and when we got home he asked if it

was all right to go in—this white feller asked if he could go in and get a drink. Q. When you left the liquor store on Jackson Street where did you go from there? A. Well, I don't know if he went by—I guess he done got the liquor then and went home. Q. Where did he get that? A. He didn't get it in the first place. We went by the other liquor store and got it. Q. On Second and James? A. Yes, sir. Then we went home, and that is when the white feller asked if he could go in, and the colored feller just follered him, and they went in the house, and my husband taken a drink and walked out, and it seemed I taken some and made me a hot toddy, and they drank it, but I wouldn't say that, because another feller I know, Vanderpool and Mr. Lamot, had come in. They taken a drink, and Vanderpool asked if Van wanted to go down and get a pint —he didn't have no permit—and he said yes, and he give him a dollar to get that, and he give the fellers— paid for the taxi fare. Q. Who did he pay? A. To the colored feller. Q. Then what happened? A. Then we went down the stairs down to get this liquor."

The party of four then entered the taxicab and proceeded toward a liquor store located at Second avenue and James street, with the view of getting more liquor; Barnett, the negro, again drove. It was during this trip that the accident occurred. For the details we will again quote respondents.

Van Court testified:

"Q. And when you got in the taxicab what happened? A. We got down between Third and Fourth on Columbia, and he pulled over to the curb and he stopped, and he said 'Give me that liquor permit, and your wife can stay in here, and I'll go around and get this at the liquor store.' We was figuring on going to Second and James. I said 'No, you don't. You turn around this cab and take us both back home,' and he said 'Do you mean that?' and I said 'Yes, I mean it.' Q. What made you say that? A. Because it looked to me like they was trying to work some scheme to get my wife away from me. And he whirled around and

come back up Cherry. When he started up that hill he throwed her in second, and he didn't stop for no stop signals or anything else. . . . Q. Then after the accident what happened? A. I asked him to take — Q. When you say 'him' who do you mean? A. The feller driving the car. Q. And that was— A. I asked him to take us to the hospital, and he said 'I'll take her to the hospital, but I wont take you,' and I said 'All right, go right on home,' and he taken me home and I had had first aid experience, so I went to work on her myself, and got the blood stopped and things until I got a doctor there."

Mrs. Van Court testified:

"Q. Then what happened? A. We started down town to get the liquor and he got down here on—I don't know how far it was down—and my husband told him to turn around and go back. Q. Why did he tell him that? A. Well, he told my husband he could get out of the cab; that he had to take me on and get the liquor, and my husband said 'You will not do no such thing; turn around and take us home.' And we started home up there and about Fifth and Cherry, and there was where he stopped the car all of a sudden. . . . Q. What did it do to you? A. I was cut and bleeding like everything and all over my dress and coat in a few minutes, and my husband asked him to take us to the hospital, and he said he wouldn't take him, but he would take me if he would get out, and we told him to take us home."

The foregoing testimony, given by respondents themselves, comprises all the evidence in support of their case with respect to the relation existing between them and the cab company.

It may be noted, however, that respondents' credibility was vigorously challenged by proof of contradictory statements made by Van Court upon another feature of the case and by their admissions of previous convictions and arrests. One of the issues upon the trial was whether White and Barnett were intoxicated

during the time that respondents accompanied them. When asked whether either of the two men gave evidence of being under the influence of liquor at the time that respondents first took passage in the taxicab, Van Court answered:

"A. No, sir. Neither one of them didn't show very drunk. The white feller didn't show drunk at all—or very drunk. The colored feller didn't show any drinking at all. I never saw him take a drink, and he never said nothing about drinking."

Later, on cross-examination, he testified:

"Q. Did they look like they were sober? A. Absolutely. Q. They looked cold-sober at that time? A. The driver was absolutely sober. Q. I mean both of them. A. The other feller talked like he might have had a drink, but he wasn't drunk. Q. Neither of them was drunk? A. The driver wasn't drunk at all. He wasn't drinking at all."

Mrs. Van Court testified:

"Q. Was there anything to indicate the colored man was not fit to drive the automobile? A. No, sir. Anyone would have thought he could drive all right, because he never acted like he was drunk at all. Q. Will you tell us the condition of the white man? A. You could tell he had been drinking before, but he knew what he was doing. He wasn't so well drunk that he didn't know what he was doing. Q. Did he seem to know what he was talking about? A. Yes. Q. Was he able to walk? A. Sure."

However, it appears from the record that, in a prosecution in police court of either White or Barnett, or both, for their conduct on the day of the accident, Van Court had testified:

"Q. Was Mr. White pretty drunk? A. Yes, sir; he was pretty drunk at all times. This boy (indicating) was not so awful drunk. At times it seemed like he was pretty drunk, and at times he acted as if he was not well enough to drive, and I didn't think that

White was using a wise head to let him drive after I found out he was the driver. I thought this boy (indicating) was the driver all the time."

On cross-examination, Van Court was asked how many times he had been arrested and convicted of drunkenness. His answer was: "I don't remember, there were so many times." Mrs. Van Court on cross-examination admitted that, on two occasions, she had been arrested on the street and put in jail for drunkenness.

Opposed to respondents' testimony was that of Steve Pendleton, owner of a one-half interest in appellant cab company. He testified, without contradiction, that White had been employed by the company over a period of three years; that White's hours of duty were from nine o'clock in the evening until six o'clock the following morning, and that he had never before failed to turn in the taxicab at the end of his shift, nor had he ever before been known to drink while driving a cab; that the company had never employed colored drivers and that no colored men drove taxicabs in the city of Seattle. He further testified that, on the night of March 25th and the morning of March 26th, White had failed to report to the dispatcher at hourly intervals, as required by the rules of the company, and that, at about five o'clock in the morning, several drivers were sent out to look for him, because there was apprehension that he had been held up and robbed; that, at about eleven o'clock, he personally went to search for White and, after making inquiry of a number of policemen, finally learned at about noon that White had been arrested after having a collision wherein the taxicab had injured a school boy.

As indicated above, the first question to be determined is whether, during the period described, the tax-

icab was being operated in the course of the owner's business.

The theory of respondents' action is that they had entered into a contract with appellant cab company for transportation, upon an agreed fare, and that the contract was breached through the negligence of appellant's agent, resulting in the injuries of which they now complain.

To establish liability on the part of the cab company, respondents were required to prove both the agency of the one in charge of the taxicab and either his actual or else his apparent authority to enter into the relation of carrier and passenger. In support of their case upon those issues, respondents invoked certain presumptions heretofore recognized by this court in actions arising in tort.

We have held, in tort actions, that, from an admission of ownership of an automobile, there arises a presumption that, at the time of the accident, the vehicle was in the possession of the owner and that the driver thereof was operating it for such owner. *Birch v. Abercrombie,* 74 Wash. 486, 133 Pac. 1020, 50 L. R. A. (N. S.) 59; *McMullen v. Warren Motor Co.,* 174 Wash. 454, 25 P. (2d) 99; *Bennett v. King County Cab Co.,* 175 Wash. 216, 27 P. (2d) 125; *Templin v. Doan,* 187 Wash. 68, 59 P. (2d) 1110; *Murray v. Kauffman Buick Co.,* 197 Wash. 469, 85 P. (2d) 1061. We have also held, in tort actions, that, where it is shown that during a particular period a company operated taxicabs in the service of the public generally, a presumption arises that, within the field of this activity, its taxicab during such period was operating in the usual course of the company's business. *Bennett v. King County Cab Co.,* 175 Wash. 216, 27 P. (2d) 125.

While such presumptions are not evidence, but only relate to a rule of law and are conclusions, they, never-

theless, serve as evidence in a proper case until overcome by competent evidence to the contrary. *McMullen v. Warren Motor Co.,* 174 Wash. 454, 25 P. (2d) 99. In considering the evidence adduced to rebut the presumption, the court is not compelled to believe the testimony of interested witnesses. *Hanson v. Eilers,* 164 Wash. 185, 2 P. (2d) 719; *Robinson v. Ebert,* 180 Wash. 387, 39 P. (2d) 992. It may, therefore, be conceded that Pendleton's testimony, being that of an interested witness, would not, of itself, be necessarily sufficient to overcome the presumption.

In disposing of the instant case, we are not called upon to decide whether the presumptions above referred to are applicable to a case where the cause of action is based on contract. For present purposes, we will assume that they are. In any event, these presumptions do not operate in favor of the party who seeks to rely upon them, when his own evidence and all the reasonable inferences to be drawn therefrom are to the contrary and there is no other evidence to support the presumption. *Hager v. Lenzi,* 152 Wash. 611, 278 Pac. 673; *Halverson v. Blosser,* 101 Kan. 683, 168 Pac. 863, L. R. A. 1918B, 498; *Hanchett v. Wiseley,* 107 Cal. App. 230, 290 Pac. 311; *Clark v. Harnischfeger Sales Corp.,* 238 App. Div. 493, 264 N. Y. Supp. 873.

The evidence in this case, submitted by respondents themselves, admits of but one conclusion, namely, that from the time that respondents first entered the taxicab until the time of the accident, the vehicle was not being operated in the course of the owner's business, but was being used by White and Barnett upon a "frolic" of their own, and that the respondents not only were aware of that fact, but themselves were parties to the escapade. The driver of the taxicab and his companion were in obvious quest of liquor for their own consumption. Respondents joined them pri-

marily for the purpose of assisting that endeavor and, in giving that assistance, went to the point of doing an unlawful thing by lending their permit with which the intoxicant was to be acquired. Payment of a fare by respondents and their subsequent transportation home did not alter the main purpose of the occasion. The business of the cab company was to transport passengers for hire, not to provide courtesy cars for their employees and those whom they might see fit to invite upon excursions of revelry.

But, if, as contended by respondents, the payment by them of an agreed fare for transportation to their home, made them passengers in a taxicab which they assumed was then regularly carrying another passenger in the person of White, and if the circumstance of the detour for liquor be entirely eliminated, it is, nevertheless, apparent that respondents' assumed relationship to the cab company had ceased when they arrived at their destination. From then on, it was simply a drinking party made up of respondents and their newly-found friends. It was upon respondents' own invitation that White and Barnett went into their home to partake of intoxicating liquor, allowing the taxicab to stand idle in the street, and the only reason that the invitees did not stay longer in the house was because the liquor supply had been exhausted.

The sole purpose of making the second trip was to replenish the supply. That was a venture in which respondents took part for the purpose of protracting the party, but the affair was wholly foreign to the business in which the appellant cab company was engaged. The mere fact that an additional guest, besides paying for the extra liquor, also paid the driver a fifty-cent fare, did not terminate the party, but only prolonged it. While the relationship during the interim of the trip may have had the semblance of passengers

riding in the conveyance of a public carrier for hire, it was in truth but one phase of a drinking party. The purpose of the arrangement was contrary to the interest and business of the appellant, and its natural result, had it been accomplished, would have made the taxicab a menace upon the streets.

The law is, as we frequently have declared, that the act complained of must have been done while the servant or agent was engaged in doing some act under actual or apparent authority from his master, not that, while engaged in the act, he is employed in the master's business; the act must have been in the *furtherance* of the master's business and such as may fairly be said to have been either expressly or impliedly authorized by the master. This statement of the law has been quoted almost verbatim from the following authorities and text: *McQueen v. People's Store Co.*, 97 Wash. 387, 166 Pac. 626; *Babbitt v. Seattle School Dist.* No. 1, 100 Wash. 392, 170 Pac. 1020; *Ennis v. Smith*, 171 Wash. 126, 18 P. (2d) 1; *Templin v. Doan*, 187 Wash. 68, 59 P. (2d) 1110; Wood, Master and Servant (2d ed.), § 307.

In this case, the act complained of was not done by anyone either actually or apparently engaged in the furtherance of appellant cab company's business. The act occurred during a venture in which the business of the company was in no way being subserved. A necessary element to respondents' cause of action is, therefore, lacking.

The determination of this question adversely to respondents disposes of the case and renders it unnecessary to pass upon the question of contributory negligence.

The judgment is reversed, with direction to the trial court to dismiss the action.

BLAKE, C. J., MAIN, JEFFERS, and ROBINSON, JJ., concur.