[No. 34733. *En Banc.* March 24, 1960.]

DALLAS W. FOOTE *et al., Appellants,* v. J. F. GRANT, *Respondent.*

DALLAS L. FOOTE *et al., Appellants,* v. J. F. GRANT, *Respondent.*[1]

[1]Reported in 350 P. (2d) 870.

*E. K. Murray & E. M. Murray* and *H. Frank Stubbs*, for appellants.

*Rosling, Williams, Lanza & Kastner* and *Joseph J. Lanza*, for respondent.

HILL, J.—We are concerned with the applicability of the rule of *respondeat superior*.

The appellants, Dallas W. Foote and Dora Foote, his wife, and Dallas L. Foote and Mazie W. Foote, his wife, sustained personal injuries when the automobile in which they were riding was hit head-on by an automobile belonging to the respondent, J. F. Grant, which was being driven on its wrong side of the road by Oscar John Wernegreen or his sister. Wernegreen had possession of the car by virtue of an agreement to drive it from Chicago to Seattle.

Each of the marital communities sued Wernegreen and Grant for the damages sustained; the cases were consolidated for trial. Wernegreen defaulted, and his negligence was conceded. From a judgment of dismissal, based on the verdict of the jury in favor of Grant, the Footes prosecute this appeal.

The sole issue is the liability of the owner of the car. Such liability, if any, rests on *respondeat superior*. The owner, a dealer in used cars in Seattle, had acquired the automobile in question in Chicago, and made arrangements for a driveaway service to procure someone who would drive the car to Seattle. The person secured was the defendant Wernegreen, and there is no contention that he was not a capable driver. He signed, and had a copy in his possession of what is termed a "MOTOR VEHICLE BAILMENT AGREEMENT" which showed the routes he was to travel in driving from Chicago to Seattle. At his specific request the routes had been altered from the direct and shortest routes (U. S. highways No. 10 and No. 12) to include "16-20-99," because he wanted to go through Yellowstone Park and Portland, Oregon on the way to Seattle.

Leaving Portland, on what was to have been the last leg of his journey, he was accompanied by his sister (contrary to his agreement which specifically prohibited his carrying

any passengers). After traveling north on highway No. 99 to Kelso, he left that highway and pursued a westerly course on a road along the Columbia river to the coast. He then proceeded northerly along the coast highway through Raymond to Aberdeen. Had he turned east at Aberdeen to return to highway No. 99 at Olympia, as he testified he intended to do, we might, by stretching the imagination, have called his side trip to the ocean an alternate route to Seattle and have held the owner of the car liable for any negligence occurring while traveling that route. However, it is an affront to reasonable minds to ask them to believe Wernegreen's incredible testimony that, traveling without a map and in complete disregard of all highway signs, he could turn west at Aberdeen, proceed through that city, then through Hoquiam, and thence perhaps ten miles northerly to an ocean beach before he realized that he was not on the way to Seattle. From the time he turned west at Aberdeen to go to Hoquiam and the beaches beyond, there can be no doubt that he was on what the cases term "a frolic of his own," and that he was in no way furthering the interests of his employer, or acting within the scope of his employment. We will hereafter discuss the significance of the fact that Wernegreen and his sister were returning from the beach north of Hoquiam to resume the journey to Seattle, from which they had deviated at Aberdeen, when the collision occurred at a point two and one-half miles north of Hoquiam.

There is much discussion in the briefs as to the effect of the so-called "bailment agreement," and as to the effect on Grant's liability, if Wernegreen's sister was driving at the time of the collision. This seems to us irrelevant. We would concede, *arguendo,* the strongest possible case for the appellants, *i.e.,* that Wernegreen was an employee of Grant and that Wernegreen's negligence (or the negligence of his sister), if that negligence occurred while Wernegreen was acting within the scope of his employment or agency or while doing anything that was furthering the interests of his employer or principal, could be imputed to Grant as the owner of the car.

■    The determinative fact is that the negligence complained of, whether Wernegreen's or his sister's, was not the act of anyone engaged in the furtherance of Grant's interests, *i.e.,* getting the car to Seattle. The principle of *respondeat superior* was not applicable at the time and place of collision. A necessary element to a cause of action against Grant is, therefore, lacking. See *Van Court v. Lodge Cab Co.* (1939), 198 Wash. 530, 89 P. (2d) 206.

■    The rules applicable in cases of this character were discussed by Judge Steinert with his customary thoroughness in *Leuthold v. Goodman* (1945), 22 Wn. (2d) 583, 157 P. (2d) 326, and a repetition of that discussion would serve no purpose here. A recent annotation (1957) entitled "Deviation from employment in use of employer's car during regular hours of work," will be found in 51 A. L. R. (2d) beginning at page 8. It will be conceded that some courts have held that where there has been a distinct or extensive departure from the scope of employment, as in this case, that the employment has been resumed by starting back, although the employee has not yet returned to his point of departure from the business route or to the immediate area where his duties would have been performed but for his departure. See § 22 of the annotation. The rationale of the Washington cases does not support such a holding; and we approve the reasoning of the cases in § 23 of the annotation, which hold that the personal venture is not terminated and the employment is not resumed until the employee has returned to his point of departure from the business route, or at least to the general area where his business duties might have brought him if he had not deviated. *Gray v. Department of Labor & Industries* (1953), 43 Wn. (2d) 578, 262 P. (2d) 533; *Sears v. Moran* (1945), 223 Ind. 179, 59 N. E. (2d) 566; *Master Auto Service Corp. v. Bowden* (1942), 179 Va. 507, 19 S. E. (2d) 679; *Bell v. Martin* (1941), 241 Ala. 182, 1 So. (2d) 906; *Model Laundry v. Collins* (1931), 241 Ky. 191, 43 S. W. (2d) 693; *Crady v. Greer* (1919), 183 Ky. 675, 210 S. W. 167. In *Master Auto Service Corp. v. Bowden, supra,* it is said (p. 513),

"The true test of liability is whether the servant was en-

gaged in his master's business and not whether he proposed to resume it. . . . It was Powell's own wrong in departing from the zone in which his master had directed him to work that created the duty to return. In so returning, he was but undoing that wrong. He was no more engaged in his master's business while returning to, than while departing from, his zone of duty."

In many situations the issue of scope of employment is a jury question, as in *Leuthold v. Goodman, supra,* but there are many cases where it is clearly a matter of law for the court. In cases such as *Nelson v. Broderick & Bascom Rope Co.* (1958), 53 Wn. (2d) 239, 332 P. (2d) 460, we have held that the trial court properly sustained a challenge to the sufficiency of the evidence against the employer; in cases such as *Ludberg v. Barghoorn* (1913), 73 Wash. 476, 131 Pac. 1165, we held the trial court properly directed a verdict for the employer; and in each of the following cases— *Barnett v. Inland Motor Freight* (1954), 44 Wn. (2d) 619, 269 P. (2d) 592; *Roletto v. Department Stores Garage Co.* (1948), 30 Wn. (2d) 439, 191 P. (2d) 875; *Mitchell v. Nalley's, Inc.* (1931), 163 Wash. 183, 300 Pac. 526; *Savage v. Donovan* (1922), 118 Wash. 692, 204 Pac. 805—we set aside a verdict for the plaintiff and directed a dismissal of the action against the employer because it was clear that the employee involved was not in the course of his employment.

In *Barnett v. Inland Motor Freight, supra,* we said (p. 621),

"We have been liberal in sustaining verdicts in the class of cases where the testimonial knowledge of the fact of agency is confined to adverse interested witnesses and where a plaintiff has only a presumption of fact to get his case past a motion for a nonsuit; however, we have required that there be shown some reasonable relationship between what the employee was doing at the time of the happening of the event upon which liability was based and the character of the employment. The latter may be so remote from the former and there be such a clear lack of relationship between the two that the court must hold as a matter of law that the burden of proof has not been sustained, or that the inferences to be drawn favorable to the plaintiff have been

so completely met and overcome that the court must hold that reasonable minds cannot differ and conclude the verdict cannot stand."

And in *Savage v. Donovan, supra,* we said (p. 696),

" . . . How much out of the way may one go and how much time may he spend, if any, not in the master's service, and yet the master be held liable? In cases of this general kind a deviation in the line of travel is often troublesome in the determination of essential and ultimate facts, but never so if it be true, as here, that the deviation is marked and continuous and in no way called for in the execution of the master's business, but indulged in only for the personal pleasure of the servant." (Quoted in part and and approved in *Nelson v. Broderick & Bascom Rope Co., supra.*)

Appellants rely heavily on Wernegreen's testimony that somebody (he didn't know who) had told him that the route did not make any difference so long as he did not go over twenty-five hundred miles and arrived in Seattle by August the 30th.

This blanket permission, if given, might be very important in an action on an insurance policy involving the coverage of one driving with the permission of the owner; but permission to use a car for the driver's own purposes does not establish the liability of the owner.

Our case of *Hamm v. Camerota* (1955), 48 Wn. (2d) 34, 290 P. (2d) 713, makes the distinction between an employee driving within the scope of his employment, and driving with his employer's permission very clear. It is stated in *Vezolles v. Home Indemnity Co., New York* (1941), 38 F. Supp. 455, 458, that the provision in the policy (permissive use) is not to be governed by the law of principal and agent, and that the purpose of the policy provision was to extend the coverage beyond the limitations that would otherwise exist under the law of principal and agent. See, also, *Wallin v. Knudtson* (1955), 46 Wn. (2d) 80, 278 P. (2d) 344.

■ The test of *respondeat superior* is not permission to use, but whether the use was at the direction or for the benefit of the employer or principal.

In summary, we reiterate that if Wernegreen had his own choice of routes to Seattle, despite the specific designation in his agreement, there might have been a justification of his choice of the much longer coast route over the designated highway No. 99; but no one has yet suggested that he was on his way to Seattle when he went to Hoquiam and north to the ocean beaches. To reach Seattle by that route would have involved a trip entirely around the Olympic peninsula. Beyond the possibility of a doubt, Wernegreen was not acting within the scope of his employment or agency, nor was he furthering his employer's or his principal's interests in any way when this collision occurred; at best, he was on his way back from a side trip or venture of his own. *Respondeat superior* has no application here.

These cases should never have been submitted to the jury as against the owner of the car, J. F. Grant. The judgment dismissing both actions as to Grant is affirmed.

WEAVER, C. J., MALLERY, DONWORTH, ROSELLINI, and OTT, JJ., concur.

FOSTER, J. (dissenting)—I dissent because the law must recognize that the automobile is the biggest killer of all time and that the application to automobile accident cases of rules developed during the preceding century regulating rights and liabilities arising out of horse-drawn traffic accidents is no longer justified.

". . . the law must, especially in contemporary conditions of articulate lawmaking by legislators, courts, and others, respond to social change if it is to fulfil its function as a paramount instrument of social order. . . ." Friedmann, Law in a Changing Society, Preface, ix.[2]

Here the negligence of the driver of the car is not in dispute. The issue is the responsibility of the owner there-

---

[2]". . . Life rebels against all efforts at legal over-simplification. . . . To do justice, to make any legal system acceptable to society, the abstract preestablished rules have to be adapted and adjusted, the static formulas made alive. . . ." Frank, Law and the Modern Mind (1949 ed.), 118, 120.

See, also, Corry, Law and Policy (1959), chapter 1, p. 3, at p. 11.

for. This responsibility should rest upon a duty owed by him to society when he commits to another the operation of his automobile upon public highways. The tests applied by the court enable the owner to immunize himself, while, in my view, the purpose of the law should be to protect society.

Fifty-three years ago, in *Jones v. Hoge,* 47 Wash. 663, 92 Pac. 433, this court took the wrong path in deciding that the automobile was not a dangerous instrumentality.[3] The court then stated:

". . . We do not think that an automobile can be placed in the same category as locomotives, gunpowder, dynamite, and similarly dangerous machines or agencies. . . ."[4]

To sustain this conclusion, the court relied upon Huddy, Law of Automobiles (1st ed., 1906), 15, chapter 3, § 2, from which the court quoted the following 1905 statistics:

" ' . . . As bearing on this question, it has been stated by authority that out of a total of 3,482 deaths reported to the coroner's office in the city of Chicago for the year 1905, only five were caused by automobiles. For every death caused by an automobile in the city of Chicago there were more than seventy deaths caused by railroad accidents.

---

[3]The holding in *Jones v. Hoge,* 47 Wash. 663, 92 Pac. 433, and other cases of that time similarly holding, was criticized even in that era of limited automobile use. See the enlightened viewpoint in Annotation, L. R. A. 1915D, 691.

The failure to apply the dangerous instrumentality theory to the automobile has been often criticized. See 2 Harper and James, The Law of Torts, 1393, 1394, § 26.10, where the following statement is made:

"So far as use of the instrumentality on a frolic, off the job, is concerned, the usefulness of the rule has been curtailed by denying its application to the one instrumentality that really matters much—the automobile. . . ."

Accord: 81 U. Pa. L. Rev. 60; 17 Cornell L. Q. 305.

[4]Cf. *Weil v. Kreutzer,* 134 Ky. 563, 121 S. W. 471 (1909), wherein it is said:

". . . An automobile is nearly as deadly as, and much more dangerous than, a street car or even a railroad car. These are propelled along fixed rails, and all that the traveling public has to do to be safe is to keep off the tracks; but the automobile, with nearly as great weight and more rapidity, can be turned as easily as can an individual, and for this reason is far more dangerous to the traveling public than either the street car or the railway train. . . ."

Twelve people were killed by wagons to every one who met death at the hands of an automobile.' "[5]

Curiously, eleven years later the court stated in *Moore v. Roddie*, 103 Wash. 386, 174 Pac. 648:

"An automobile is a dangerous instrumentality. . . ."

but recanted on rehearing eight months later:

"We are not now disposed to adopt the daring innovation, as a legal principle, that an automobile is, *per se*, a 'dangerous instrumentality.' " *Moore v. Roddie*, 106 Wash. 548, 180 Pac. 879.[6]

The nation's population by the 1900 census, the last one preceding *Jones v. Hoge, supra*, was 76 million, but since has more than doubled. The census bureau's estimate of July, 1958, was 174 million. The increase in the number of automobiles has been even more astronomical. In 1909, the nation had 250 thousand automobiles, but, by the end of 1910, this had increased to 400 thousand. In 1958, there were over 67 million registered motor vehicles with over 79 million registered drivers. But the metamorphosis of the automobile itself has been even more phenomenal. A comparison of the two is akin to that of an Indian dugout canoe and an atomic powered submarine. This is emphasized by the contrast of the present sixty-mile-per-hour speed with the now curious statute regulating speed at the time of the decision in *Jones v. Hoge, supra*.[7]

"No vehicle yet devised by man has proved . . . so 'convenient and useful' . . . as the automobile. Nor has any mode of travel had such appalling consequences to life and limb. . . ." 1 Blashfield, Cyclopedia of Automobile Law and Practice, 1, § 1.

[5] In marked contrast, in 1957, the motor vehicle death toll in Chicago was 318, far exceeding the number killed in railroad or wagon accidents, or both combined.

[6] *Cf. Allen v. Schultz*, 107 Wash. 393, 181 Pac. 916, 6 A. L. R. 676, decided the following year, wherein the court, in a different context, stated:

". . . One who operates on the streets of a city such a dangerous instrumentality as an automobile is bound to take notice that he may be called upon to make emergency stops, and it is negligence on his part not to keep the automobile in such condition that such stops are possible."

By 1951, one million people in this nation had met death in automobile traffic mishaps, more than the fatalities in all of the nation's wars. In the year 1958, the last one for which reliable statistics are available, there were 37 thousand traffic fatalities.[8] Studies indicate that any significant reduction in this incidence of destruction is but wishful thinking. Thus it is that the court's 1907 hypothesis that the automobile is not a dangerous instrumentality is slain by the facts.[9]

The many statutory traffic regulations have public protection as their object. The financial responsibility act has the same purpose. Laws of 1959, chapter 38, p. 366; RCW 46.24; RCW 46.28. Such statutes are a partial response to a recognition of the inherent danger of motor vehicle traffic.

We are admonished by Art. I, § 32, of the state constitution:

---

[7]"No person, driver or operator in charge of any automobile or motor vehicle on any public road, highway, park or parkway, street or avenue within the state shall drive, operate, move, or permit the same to be driven, operated or moved at a rate of speed faster than one (1) mile in five (5) minutes with in [within] the thickly settled or business portion of any city or village within this state, nor outside of such thickly settled or business portion of any city or village on any public road, highway, park or parkway, street or avenue, at a rate of speed faster than one (1) mile in two and one-half (2½) minutes; nor over any crossing or cross-walk within the limits of any city or village, at a rate faster than one mile in fifteen (15) minutes when any person is upon the same." 2 Remington & Ballinger 810, § 5571.

[8]Some 2,825,000 people suffered nonfatal injuries in motor vehicle accidents in 1958. One out of every sixty-one Americans was killed or injured on the highways in that year.

[9]Accident Facts (1958 ed.), published by the National Safety Council; Green, Traffic Victims: Tort Law & Insurance (1958) 63, 85, chapter 3; 34 Cal. State Bar Jour. 393; 11 U. Fla. L. Rev. 175, 176; 36 Jour. Crim. Law & Criminology 349; 287 The Annals 13 (1953); 116 The Annals 174 (1924); Annual Statistical Report of Motor Vehicle Traffic Accidents, Wash. State Patrol (1958). The last cited report shows that in the state of Washington in 1958, 573 people were killed on the highways, 28,289 were injured, and the economic loss attributable to the 73,350 reported accidents amounted to $68,449,180. It might also be noted that the Washington statistics are prepared in compliance with a legislative commandment, RCW 46.52.060.

"A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government."[10]

Logic and experience alike demonstrate that we should apply to the present problem not the rules developed in the preceding century to govern horse-drawn traffic, but, instead, the law applicable to dangerous instrumentalities.[11]

Forty years ago the supreme court of Florida did so in *Southern Cotton Oil Co. v. Anderson,* 80 Fla. 441, 86 So. 629, 16 A. L. R. 255, in which it stated:

"Wild animals and high explosives are dangerous *per se*; that is, they may inflict injury without the immediate application of human aid or instrumentality. Neither a locomotive, a trolley car nor an automobile is dangerous *per se* —by or through itself—in that neither can inflict injury to a person except by its use or operation. A locomotive in the roundhouse, a trolley car in the barn, an automobile in a garage are almost as harmless as canary birds; but in operation they are dangerous instrumentalities, and the master who intrusts them to another to operate—the one on its right-of-way, the others on the public highways— cannot exonerate himself from liability for injury caused to others by the negligence of those to whom they are entrusted. As said in *Barmore v. Vicksburg S. & P. R. Co., supra* [85 Miss. 426, 38 So. 210]:

" 'The servant is empowered by the master to discharge certain duties, and it is incumbent upon him to exercise the same care and attention which the law requires of the master; and if that care and attention be about the management and custody of dangerous appliances, the master can-

---

[10]Justice Holmes' statement is similarly applicable:

". . . history is the means by which we measure the power which the past has had to govern the present in spite of ourselves, so to speak, by imposing traditions which no longer meet their original end. History sets us free and enables us to make up our minds dispassionately whether the survival which we are enforcing answers any new purpose when it has ceased to answer the old. . . ." Holmes, Collected Legal Papers, Law in Science and Science in Law, 210, 225.

[11]". . . Precedents drawn from the days of travel by stage coach do not fit the conditions of travel to-day. The principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be." *MacPherson v. Buick Motor Co.,* 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F, 696.

not shift the responsibility connected with the custody of such instruments to the servant to whom they have been entrusted, and escape liability therefor. This rule arises from the absolute duty which is owing to the public by those who employ in their business dangerous agencies or appliances, engines, or instruments liable, if negligently managed, to result in great damage to others.' "[12]

Many states have by statute applied the dangerous instrumentality doctrine to owners who entrust the operation of automobiles to others. The California vehicle code, § 402(a), is illustrative:

"Every owner of a motor vehicle is liable and responsible for the death of or injury to person or property resulting from negligence in the operation of such motor vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner, and the negligence of such person shall be imputed to the owner for all purposes of civil damages."[13]

---

[12]This decision has been approved and since followed in Florida. See, for example, *Lynch v. Walker*, 159 Fla. 188, 31 So. 268; *D'Allessandro v. Bechtol*, 104 F. (2d) 845, cert. den. 308 U. S. 619, 84 L. Ed. 517, 60 S. Ct. 295. See, also, the discussions in 5 Minn. L. Rev. 322; 11 U. Fla. L. Rev. 135; 5 U. Fla. L. Rev. 412.

Another decision adopting this viewpoint is *Ingraham v. Stockamore*, 63 Misc. 114, 118 N. Y. S. 399. See, also, *Reese v. Buhle*, 16 Ill. App. (2d) 13, 147 N. E. (2d) 431; and the concurrence of Rossman, J., in *McDowell v. Hurner*, 142 Ore. 611, 617, 629, 20 P. (2d) 395, 88 A. L. R. 578. *Schweinhaut v. Flaherty*, 49 F. (2d) 533, held the dangerous instrumentality doctrine applicable to taxicabs, but did not extend the doctrine to cover private motor vehicles. The illogic of so limiting the holding was pointed out in 17 Cornell L. Q. 305, and in the dissenting opinion of Judge Hitz in *Simon v. City Cab*, 78 F. (2d) 506, 509.

In *Seleine v. Wisner*, 200 Iowa 1389, 206 N. W. 130, the court upheld the constitutionality of a statute imposing liability on a car owner where a person driving with his permission negligently injures another, basing the decision on its recognition of the automobile's dangerous character. The Massachusetts supreme court, in *Opinion of the Justices*, 251 Mass. 569, 147 N. E. 681, recognized the dangerous character of the automobile in advising the state legislature that a pending financial responsibility act was constitutional.

[13]"Several states have enacted legislation having the same or a similar effect: CAL. VEH. CODE ANN. § 402 (Deering 1948); D. C. CODE § 40-403 (1940); . . . IOWA CODE § 321.493 (1946); MICH. STAT. ANN., § 9.2101 (Rev. 1952). . . ." 5 U. Fla. L. Rev. 412, 413, note 6.

See, also Minn. Stat. Ann., § 170.54 (1945); 5 R. I. Gen. Laws 924, § 31-31-3; N. Y. Vehicle & Traffic Law, § 59.

Like *Jones v. Hoge, supra,* the law relied upon by the court is all judge made. The court should not hesitate to correct judicial mistakes by passing the burden to the legislative branch of the government.[14] In two conspicuous recent examples, the court courageously exercised its judicial responsibility. *Pierce v. Yakima Valley Memorial Hospital Ass'n,* 43 Wn. (2d) 162, 260 P. (2d) 765; *Grein v. LaPoma,* 54 Wn. (2d) 844, 340 P. (2d) 766.[15]

That uncompensated victims of automobile traffic accidents have created an unsolved national problem is demonstrated by the Columbia study of compensation for automobile accidents (1932). Some progress has been made by legislation but the problem remains unsolved. See 59 Col. L. Rev., James, The Columbia Study of Compensation for Automobile Accidents: An Unanswered Challenge (1959), 408.[16] Judicial responsibility should not be evaded.

The circumstances before us very clearly demonstrate the necessity of public protection. The driver, Wernegreen, had recently graduated from an educational institution and desired to return to his home in Portland, Oregon, from Chicago. Like most students, his finances were meager so he eagerly embraced the opportunity to drive the respon-

---

[14] ". . . that two generations ought never to have suffered from the baleful judgments of Abinger and Shaw." *Stertz v. Industrial Ins. Comm.,* 91 Wash. 588, 158 Pac. 256.

See, also, "Stare Decisis" by Justice William O. Douglas, 49 Col. L. Rev. 735, 747.

[15] See 11 Syracuse L. Rev. 119; 33 So. Cal. L. Rev. 104.

[16] James and Law, Compensation for Auto Accident Victims: A Story of Too Little and Too Late, 26 Conn. Bar Jour. 70; Green, Traffic Victims: Tort Law & Insurance (1958); Ehrenzweig, "Full Aid" Insurance for the Traffic Victim (1954); A symposium of articles in 15 Ohio St. L. Jour. 101-185; 66 Harv. L. Rev. 1300; 47 Georgetown L. Jour. 700; 19 Brooklyn L. Rev. 11; 44 American Bar Ass'n Jour. 354; 42 American Bar Ass'n Jour. 421; 2 Harper and James, The Law of Torts, chapter 11, p. 729, and chapter 13, p. 759; 287 The Annals 83; 25 State Government 266 (December, 1952); Association of the Bar of the City of New York, Report on Problems Created by Financially Irresponsible Motorists (1952); Unsatisfied Claim and Judgment Fund Law, Maryland Ann. Code (1957), Art. 66½, §§ 150-179, which attempt to deal with the problem; *Allied American Mut. Fire Ins. Co. v. Commissioner of Motor Vehicles,* 219 Md. 607, 150 A. (2d) 421.

dent's car from Chicago to Seattle. The respondent, a used-car dealer in Seattle, bought the automobile in Chicago for anticipated profit in the course of his business, and entrusted a commercial agency to procure a driver to deliver it to his Seattle place of business. The predeparture directions for the two-thousand-mile journey from Chicago to Seattle were evanescent at best, and deviation therefrom was, indeed, foreseeable. Public policy forbids that, under such circumstances, an owner should be immunized from liability to innocent third parties.

When the owner entrusts the operation of his vehicle to others, his responsibility therefor should be that of the owner of a dangerous instrumentality. The incidence of public danger is the same whether the driver is a borrower or one whose activities are within the scope of the conventional master and servant relationship. These relationships should have significance only in determining the rights and liabilities as between the owner and driver and have no place in determining the owner's duty to the public.

The practices leading to the disaster presently before us are not inherently wrong, but the owner resorting to them owes the public the duty of protection.

I would reverse the judgment.

FINLEY, J., concurs with FOSTER, J.

HUNTER, J. (dissenting)—I concur in the result of the dissent.

FINLEY, J. (dissenting)—I concur with both the result reached in the dissenting opinion and with what I conceive to be the underlying reasoning therefor. However, I think that some clarification is desirable respecting so much of the opinion as denominates the automobile a *dangerous instrumentality*. The term has been used from time to time by lawyers and judges to describe an instrumentality which, no matter how carefully used, is inordinately dangerous. As a consequence of this quality, the principle of absolute liability, without regard to what is normally characterized as fault or blame, has been applied in those cases wherein

harm results from the use of such an instrumentality. In the early days of the automobile, when it was strange and new and of limited utility, a number of courts held that it was just such a dangerous instrumentality. In certain portions of Europe it is still regarded as such. However, the courts of this country are now unanimous in holding that the operator of an automobile is liable only for negligently caused harm. As both use and social utility of the automobile have increased, it has generally become recognized that the *carefully* driven automobile is not inordinately dangerous.

However, as graphically set out in the dissenting opinion, our experience has also taught us that the *negligently* driven automobile is a tremendously dangerous thing, in terms of the seriousness of both the physical injuries and property damage it can cause. Often, however, the actual operator of the vehicle, whose negligence caused the harm, is financially unable to adequately compensate the injured person. Recognizing this fact, both courts and legislatures throughout the country have taken steps to remedy this situation. Compulsory liability insurance is one answer. The so-called "family car doctrine," making the owner of an automobile liable for its negligent operation by a member of his family, is another. Implicit in this latter solution is the notion that the owner of the automobile is more likely to be financially responsible than is the nonowning operator. As noted in the dissenting opinion, the legislatures of several states have gone one step farther with this same idea and have enacted statutes making the owner liable for the automobile's negligent operation by any person who is using the car with the owner's permission.

The Florida court has taken this same step without waiting for the legislature to act. However, somewhat unfortunately, because of the implications of absolute liability in the conventional sense which are often attached to the term, the Florida court has based its rule on a characterization of the automobile as a dangerous instrumentality. It is clear, however, from a reading of the many Florida cases

wherein the rule has been applied that the Florida court has not imposed absolute liability for all harm resulting from the operation of an automobile. See 5 Fla. L. Rev. 412. As I read it, the dissenting opinion in the instant case does not propose doing so. Fault on the part of the operator must still be proved. Also, it must be proved that the negligent operator was using the car with the permission of the owner. Thus, though the automobile is designated a dangerous instrumentality, it is only the negligently driven automobile, driven with the consent of the owner, that occasions liability as to the owner.

With these considerations in mind I have signed and concur in the views expressed in the dissenting opinion by Judge Foster.

HUNTER, J., concurs with FINLEY, J.

