[No. 29232. Department One. March 23, 1944.]

ANTONE S. CARLSON *et al., Respondents,* v. ED WOLSKI *et al., Appellants,* DAVID E. PUGH, *Defendant.*[1]

[1]Reported in 147 P. (2d) 291.

*Colvin, Rhodes & Franklin,* for appellants.

*Vandeveer, Bassett & Geisness,* for respondents.

JEFFERS, J.—This action was instituted by Antone S. Carlson and wife against Ed Wolski and wife and their grandson, David E. Pugh, to recover damages claimed to have been sustained by Carrie Carlson as the result of being struck by an automobile owned by defendants Wolski and wife, but being driven at the time of the accident by defendant Pugh.

Defendants by their answer admit and deny certain allegations of the complaint, and then set up two affirmative defenses. In view of the statement of points to be relied upon by appellants on this appeal, it will be necessary to refer only to the second affirmative defense, wherein it is alleged that, at the time of the accident, defendant David E. Pugh was operating the automobile without the authority or consent of the defendant Wolski and wife, or either of them, and contrary to instructions, orders, and directions of the last-named defendants.

The reply denies the affirmative allegations of the answer.

The cause came on for trial before the court and jury, and thereafter the jury returned a verdict in favor of plaintiffs and against defendants. Motions for judgment notwithstanding the verdict and for new trial were filed by plaintiffs, and denied, and, on September 28, 1943, judgment was entered on the verdict. This appeal by defendants Ed Wolski and wife followed.

Appellants, at the time of filing the statement of facts, filed a statement of points upon which they would rely on this appeal. We quote from the statement of points:

"That Ed Wolski and Ethel Wolski, defendants herein, will urge upon appeal of this cause to supreme court that they are not liable as owners of the car in question for the negligence of the driver of the car in question by defendant Pugh, *because the car was not being used at the time of the accident for family purposes and was being used at said time by said Pugh without permission of the owners, defendants Wolski and wife.* That at the time of the accident the said Pugh in driving said automobile was not in any way the agent of the defendants Wolski and wife.

"No question will be raised on appeal as to the negligence of defendant Pugh or as to the extent of the plaintiff's injuries or that the verdict of the jury was excessive." (Italics ours.)

The assignments of error are: (1) In entering judgment against appellants; (2) in denying appellants' motion for judgment notwithstanding the verdict; (3) in denying appellants' motion for new trial; (4) in denying appellants' motion for nonsuit at the close of respondents' case; (5) in denying appellants' motion for a directed verdict at the close of all the testimony; (6) in giving instruction No. 16; (7) in refusing to give appellants' requested instruction No. 9.

It is apparent that assignments of error Nos. 1 to 5, inclusive, raise the question of appellants' liability, if any, under the family car doctrine.

It might be well, before discussing the facts in this case, to have in mind some of the rules announced in *Birch v. Abercrombie,* 74 Wash. 486, 133 Pac. 1020, 50 L. R. A. (N. S.) 59, which counsel concede is the pioneer case dealing with

the question before us. In the cited case it was contended on behalf of the defendants Abercrombie and wife that, even conceding that a case was made as against the daughter, the evidence exonerated them from liability, in that the automobile was at the time in use by the daughter for a *purpose of her own,* and not as their servant or agent. The jury, in addition to the general verdict, found in answer to special interrogatories:

"(1) That Frances Abercrombie was at the time of the accident driving the machine for her own pleasure; (2) that she was not driving the machine without the knowledge or consent of her parents express or implied; (3) that her parents had not prior to the accident ordered or directed her not to drive the machine."

Following the above statement, the court said:

"It is well established that, in cases of this kind, where the vehicle doing the damage belonged to the defendants at the time of the injury, that fact establishes *prima facie* that the vehicle was then in the possession of the owner, and that whoever was driving it was doing so for the owner. [Citing cases.] The burden was thus cast upon the appellants to overcome this presumption by *competent* evidence and it was for the jury to say upon such evidence whether the burden had been sustained." (Italics ours.)

The court, after reviewing the evidence, stated:

"There being competent evidence from which the jury might reasonably find as it did, we must assume that Frances Abercrombie had been permitted the use of the machine and that she was at the time of the accident using it with the consent of her parents."

The court then stated:

"This reduces the consideration of the appellants' contention under this head to answering a single question: *If Frances Abercrombie was driving the automobile for her own pleasure,* were the father and mother, notwithstanding that fact, liable for the injury to the respondent resulting from her negligence under the other evidence adduced?

"It is conceded that an automobile is not an agency so dangerous as to render the owner liable for injuries to travelers on the highway inflicted thereby while being driven by another, irrespective of the relation of master and

servant or agency as between the driver and the owner, and we have so held. . . .

"It must also be conceded that a parent is not liable for the torts of his child solely on the ground of relationship. The liability, if any exists, must rest in the relation of agency or service." (Italics ours.)

In the course of the further discussion of this question, the court stated:

"It seems too plain for cavil that a father, who furnishes a vehicle for the customary conveyance of the members of his family, makes their conveyance by that vehicle his affair, that is, his business, and any one driving the vehicle for that purpose with his consent, express or *implied,* whether a member of his family or another, is his agent. The fact that only one member of the family was in the vehicle at the time is in no sound sense a differentiating circumstance abrogating the agency. It was within the general purpose of the ownership that any member of the family should use it, and the agency is present in the use of it by one as well as by all." (Italics ours.)

Let us now look at the testimony in the case at bar.

David Pugh was called by respondents as an adverse witness, and testified in substance as follows: On March 13, 1941, when the accident occurred, he was sixteen years of age, and was living with his grandparents, Mr. and Mrs. Wolski, in Renton. At that time the Wolskis owned two Buick automobiles, the newer of which was used as a family pleasure car, and the other as a business car. On the day of the accident, David was driving the newer Buick, and was alone in the car. We quote David's testimony at this point:

"Q. How frequently had you driven that car before the accident? A. Whenever I had permission to take it. Q. Do you want to tell us that you always asked permission to take it? A. Yes, sir. Q. You always got permission? A. Not always. Q. Where were you going at the time of the accident? A. Down to Simonize the car at a friend's house. Q. Simonize it? Polish it? A. Right at the time of striking her? Q. You were on your way some place. Where were you going at that time? A. I was going to the Lighthouse for a hamburger."

The witness testified he had driven the car to basketball games at Kent and possibly Enumclaw. He was not sure as to the latter place. When he went to these games he took his friends with him, and they were usually out until eleven or twelve o'clock. After the games, David and his friends would usually drive to the Lighthouse or some other place to get something to eat.

According to David's testimony, on the afternoon of the accident he obtained permission from his grandfather to take the car to the home of a friend by the name of Jones, where he and the Jones boy were going to simonize the car. He finished simonizing the car about six o'clock, having gone home to his supper in the meantime, and then drove the car to his mother's home, also in Renton. At the request of his mother, he drove the car to get some groceries for her. After this he drove back to the Jones boy's home, as the latter was going home with him, but, as this boy was not ready to leave, David drove over to a service station where another friend, Manuel Phillips, worked. This friend asked David to go to the Lighthouse and get some hamburgers, and it was while David was on the way to the Lighthouse that the accident occurred. According to David's testimony, the accident happened sometime after seven o'clock, as it was dark and he had his lights on. After the accident, David drove the car to the police station, having been told so to do by Officer McCarthy.

David further testified that the route he followed going to the Lighthouse from the service station was not the one he would take to go home.

The witness was asked the following questions:

"Q. Under just what circumstances were you permitted to use the newer Buick? A. When I asked permission,—when I had a good reason, such as a basketball game or a football game or had to put gas or oil in it, or something like that. . . . Q. Were you allowed to take it out of the garage and drive around without permission? A. No. Q. Sometimes, you acted as chauffeur for your grandmother? A. Yes. . . . Q. Your grandmother does not drive a car? A. No. Q. You had permission to take the car to the Jones boy's house and have it Simonized? A.

Yes. Q. Did you have permission to take the car,—go get this hamburger for this other boy, Phillips? A. No. . . ."

On redirect examination, David testified as follows:

"Q. For instance, you wanted to get a sandwich after the game, did you always ask permission,—you would say to the grandfather, 'After the game, I am going to take the car down to get a sandwich?' A. That was usually understood. Q. That was usually understood? A. Yes. Q. It was implied you had a right to do that? A. Yes."

Officer McCarthy testified that he questioned David at the scene of the accident, and David told him "he was going to the Lighthouse for a hamburger." It does not appear whether he said for himself or the Phillips boy or for both. David continued to drive the car after the accident, and after it had been repaired. Manuel Phillips testified that he asked David to drive to the Lighthouse and get him a hamburger. Mr. Wolski testified that David lived with him, and was permitted to use the newer Buick.

"Q. Tell the jury in your own words under what circumstances and how that was handled. A. Well, when he wanted to go to a basketball game,—high school function he would ask permission to use the car. At times, I gave permission and at different times, I didn't. Q. Would you give him instructions? A. Well, yes, he would be instructed when he took the car, after the game, to come on home. He would ask permission, *as a rule*, if he could stop for a sandwich,—had been in the habit of stopping at the Lighthouse for a sandwich before they came home. Q. Was he at times given that permission? A. Yes, we usually allowed him when he had the car. Q. Did he ever, to your knowledge, use the car without permission? A. Never. Q. I will ask you this,—on March 13th, will you tell the jury, the date of his collision, what permission he had at that time to use it? A. When I was home,—came home to get my lunch, he asked permission to take the car down to Jimmie Jones' house and Simonize it and I told him, yes, I thought that would be all right and he took the car to Jimmie Jones' house and Simonized it. After that he drove down to his mother's. . . . Q. Now, did you give him any permission on that particular day to drive the car any place except to Jones' house to Simonize it? A. No."

On cross-examination, Mr. Wolski testified that David had lived with his grandparents practically all his life.

"Q. You knew he was driving the car to basket ball games and football games and you consented to that? A. Yes. Q. Where were these seven high schools located that he told us about? A. I know they have gone to Kent. That would be about the only one I could answer correctly. I know they have gone to Kent. He could have gone to Enumclaw or Sumner. Q. He would have gone there? A. At different times,—not all the same night. . . . Q. You never denied him taking that car to games? A. I have yes. Q. You have denied him? A. I have denied him. Q. For what reason? A. For the simple reason that weather conditions would be bad. Foggy or bad nights I would not let him take it. Q. That would be the only reason? The weather was bad? A. That would be the only reason. Q. You knew he was taking to these games other people? Friends of his in school? A. That was one reason I let him take the car,—so a bunch could go to the games. Q. You wanted him to entertain his friends,—be sociable with them? Is that right? A. Right. Q. You knew that after the games he took them to restaurants? A. How is that? Q. Places where they could eat? A. They had that understood. They had something to eat after they came back from the game. Q. He didn't tell you in advance, exactly where? A. As a rule, he named the Lighthouse. Q. Would you insist on him naming the place he was going to? A. No, I didn't. Q. He would also take these people home? A. That I could not tell you. . . . Q. On the evening this happened, Mr. Wolski, if he had said to you, 'A friend of mine is working late and I am going to drive down and get him a sandwich,' I suppose you would have objected? You would have said, no. A. I don't know. It all depends on what mood I was in."

Mrs. Wolski did not remember David's asking permission to take the car on the day of the accident, but did remember that he had the car at the Jones's. She also testified that the rule was that David would ask his grandfather when he wanted to use the car; that on a few occasions she had David drive her to different places.

Appellants contend that at the time of the accident the car was not being driven for any purpose of the owner, or for the family pleasure, but was being driven exclusively

for the convenience and purpose of the witness Manuel Phillips.

The rule announced in *Birch v. Abercrombie, supra,* that, where the vehicle doing the damage belonged to the defendants at the time of the injury, that fact establishes, *prima facie,* that the vehicle was then in the possession of the owner, and that whoever was driving it was doing so for the owner, has been cited with approval in the following cases: *Steiner v. Royal Blue Cab Co.,* 172 Wash. 396, 20 P. (2d) 39; *Templin v. Doan,* 187 Wash. 68, 59 P. (2d) 1110; *Van Court v. Lodge Cab Co.,* 198 Wash. 530, 89 P. (2d) 206.

This court has also consistently followed the rule announced in *Birch v. Abercrombie, supra,* that one who furnishes a vehicle for the customary conveyance of the members of his family, whether for business or solely for pleasure, makes the transportation of such persons by that vehicle his affair, that is, his business, and anyone driving the vehicle for that purpose, with his consent, express or implied, whether a member of the family or another, is his agent. *Hanson v. Eilers,* 164 Wash. 185, 2 P. (2d) 719; *Hart v. Hogan,* 173 Wash. 598, 24 P. (2d) 99. In the case last cited, we emphasized the fact that we had not receded from the family car doctrine, under which a broad liability is imposed on the husband when his car is operated by the wife *for her own pleasure,* and that the rule is the same whether the automobile is operated on the occasion in question by the wife or by some other member of the family.

*King v. Cann,* 184 Wash. 554, 52 P. (2d) 900. This case, after citing the rule announced in *Birch v. Abercrombie, supra,* distinguishes the case of *Warren v. Norguard,* 103 Wash. 284, 174 Pac. 7 (cited by appellants herein), in these words:

"In the *Warren* case, *supra,* the recovery against the parents was denied because in that case the facts showed there was no relationship of agent or servant. The automobile was not being driven on any business or for the pleasure of the owners of the car or the family."

*King v. Williams,* 188 Wash. 350, 62 P. (2d) 710; *Buss v. Wachsmith,* 190 Wash. 673, 70 P. (2d) 417. The rule in

*Birch v. Abercrombie, supra,* was cited, but the court held there was no necessity for invoking the family car doctrine, as it was conceded that Wachsmith, Jr., was engaged in his father's business.

*Dillon v. Burnett,* 197 Wash. 371, 85 P. (2d) 656. In this case, the court referred to the case of *Hart v. Hogan, supra,* and stated the rule therein announced to be that:

" 'One who furnishes an automobile for the use of his family is liable to a third person for injuries sustained as the result of the negligence of a member of the family in the operation of the automobile for such member's pleasure.' "

· In the course of the opinion in the cited case, we quoted from 7-8 Huddy, Automobile Law (9th ed.), 320-326, § 125, as follows:

" 'The family group is not necessarily confined to persons related to the owner. It embraces all the members of the collective body of persons living in his household, for whose convenience the car is maintained and who have authority to use it.' "

*Werker v. Knox,* 197 Wash. 453, 85 P. (2d) 1041. In this case, the court went to some length in setting forth the reasons for the adoption of the family car doctrine, as stated in *Birch v. Abercrombie.*

*Cook v. Rafferty,* 200 Wash. 234, 93 P. (2d) 376; *Moffitt v. Krueger,* 11 Wn. (2d) 658, 120 P. (2d) 512; *Davis v. Browne, ante* p. 219, 147 P. (2d) 263. All of the above-mentioned cases emphatically declare that they are not departing from the rules announced in *Birch v. Abercrombie.* Of course, the factual situations presented are different, but it is impossible to escape the conclusion that this court has. gone a long way to uphold the family car doctrine.

█ Because of the apparent conflict in some of our decisions as to whether or not the presumption of agency which arises on proof of ownership of an automobile is overcome by the testimony of interested witnesses, this court, in *Bradley v. S. L. Savidge, Inc.,* 13 Wn. (2d) 28, 123 P. (2d) 780, exhaustively reviewed the decisions of this and many other jurisdictions, and then announced the rule that, while the presumption or inference of fact arising from proof of

ownership of an automobile may be overcome by *competent evidence* from either interested or disinterested witnesses, nevertheless, to overcome such presumption, the testimony must be uncontradicted, unimpeached, clear, and convincing. If the court should determine that the testimony is of that degree and character, and if such testimony is not met by controverting evidence on the part of the plaintiff, the case must be determined upon motion for a directed verdict.

If, on the other hand, the trial court should be of the opinion that, whatever may be the value of defendant's evidence, it has not attained the degree and character required for the purpose of a directed verdict, the case should be submitted to the jury, to be decided by it on all the evidence then before the court.

In the instant case, the court denied appellants' motion for a directed verdict, and the cause was submitted to the jury, which returned a verdict in favor of respondents. As the judgment was against the community composed of Mr. and Mrs. Wolski, both of these parties were, of course, vitally interested in the outcome of the action, as was David Pugh, who was a party defendant.

The factual situation in the instant case is different from that presented in some of the cases cited, in that in the instant case it is admitted that express permission was given to David to drive the car to the Jones house to simonize it.

The question then arises as to whether or not, under the facts, the court should have held as a matter of law that David had neither express nor implied permission to use the car for the purpose for which it was being used at the time of the accident.

We are of the opinion the court properly concluded that the question of whether or not David had at least implied permission to use the car for the purpose for which it was being used, was a factual one to be decided by the jury, and that the court therefore properly denied the motion for a directed verdict.

While it is true that appellant Wolski and David testified that David had permission only to drive the car to the Jones

boy's house, it seems to us, considering all the testimony, the question of whether or not David had implied authority to use the car for the purpose for which it was being used was one to be determined by the jury.

As we read the testimony, there had never been any particular restrictions placed on David as to the route he should follow in going to or returning from places he was permitted to go, nor was any time fixed for his return. It was admitted that he had implied authority to go to some eating place after his return from the basketball or football games. Just where he went on these occasions, or how much out of the regular traveled route to his home the places were, does not appear. Mr. Wolski testified that one of the reasons he allowed David to use the car was that he might entertain his friends—be sociable.

It seems to us it is reasonable to conclude, from all the evidence, that all that was required of David was that he tell his grandfather the general purpose for which the car was to be used. As we have said, David had been allowed to use the car for his own pleasure and that of his friends, and we do not think it is going too far to say that, in this case, it was a pleasure to David to be able to gratify a desire of his friend. We are not inclined to draw the line as fine as would, in our opinion, be necessary in order to hold that at the time of the accident the car was being driven exclusively for the convenience and purpose of Manuel Phillips, and not for the pleasure of a member of appellants' family.

We call attention to the case of *Moffitt v. Krueger, supra.* While the primary question presented in that case was whether or not the community was liable under the family car doctrine, the case is of particular interest, because of the purpose for which the car was being used by the wife at the time of the accident.

We also call attention to the case of *King v. Cann, supra,* which deals particularly with the question of restrictions put upon the use of the car there involved.

We do not deem it necessary to discuss the cases cited by appellants, other than the case of *Schnebly v. Bryson,* 158 Wash. 250, 290 Pac. 849. It may be stated here that,

while the *Schnebly* case has been distinguished in a number of our later decisions, it has never been followed. Without discussing the reasons given for distinguishing it in some of our later cases, we are of the opinion the case is not controlling here, for the reason that in it no question of implied authority was raised, nor could it have been raised, because it does not appear from the opinion that Miss Bryson had ever driven the car, or that she could drive. All we have is the consent of Miss Bryson's parents to the use of the car to go to a dance.

We are of the opinion the jury, in the instant case, was justified in finding from the evidence that at least implied authority was given to David to use the automobile for the purpose for which it was being used at the time of the accident. It follows that the court properly denied appellants' motion for judgment notwithstanding the verdict.

 Appellants' assignment of error No. 6 is based upon the giving of instruction No. 16. The specific objection to this instruction is that there was no place in this case for implied permission, and that the court therefore erred in instructing the jury that,

"If you find that the car driven by the defendant Pugh was being used with the permission, express or implied, of the owners, then, if you find the defendant David E. Pugh is liable, you must find the owners liable also."

In view of what we have hereinbefore stated, it is apparent that the trial court did not err in submitting to the jury the question of implied permission.

 Further objection is made to this instruction on the ground that the instruction makes permission the sole test, and that it fails to include the further condition that the jury must find that the car was being used either for the business or the pleasure of the owner. We are of the opinion appellants place too narrow a construction on this instruction. Just preceding the paragraph of instruction No. 16 above quoted, is the following paragraph:

"If you find that the driver did not have the permission of the owners at the time, then the defendants Wolski and

wife are not liable, regardless of your decision as to the driver."

What do the words "permission of the owners at the time" mean? In our opinion, under the pleadings and proof, they can only mean, and the jury undoubtedly understood them to mean, permission of the owners to use the car for the purpose for which it was being used at the time of the accident. We are also of the opinion it would have been impossible, under the pleadings and the facts in this case, to have found that the use was permissive, but not for a family purpose, within the meaning of the family car doctrine. The instruction, therefore, was not prejudicial to appellants.

■ Neither do we believe there was any prejudicial error, if error at all, committed by the court in refusing to give appellants' requested instruction No. 9. In the first place, the instruction states:

"If you find from the evidence in this case that the said defendant David E. Pugh was only allowed to use said automobile with the special permission of Mr. and Mrs. Wolski . . . ."

The permission given on the day of the accident, according to the testimony of appellant Wolski and David Pugh, was no different from that given on other occasions. The question of permission was covered by instruction No. 16 as given. We are also of the opinion no prejudicial error was committed in refusing to give this instruction, for the reasons given for concluding that no error was committed in giving instruction No. 16.

The motion for new trial was properly denied. The judgment of the trial court is affirmed.

SIMPSON, C. J., BEALS, STEINERT, and GRADY, JJ., concur.