[No. 21199-1-III.   Division Three.   July 10, 2003.]

CORISSA KAYNOR, *Individually and as Personal Representative, Appellant,* v. NICHOLAS FARLINE, ET AL., *Defendants,* KAREN DAHL-GREEN, ET AL., *Respondents.*

*Rodney K. Nelson* and *John S. Kapuza*, for appellant.

*George B. Fearing* (of *Leavy, Schultz & Fearing, P.S.*) and *Brad E. Smith* (of *Huppin Ewing Anderson & Paul, P.S.*), for respondents.

KURTZ, J. — Corissa and Christopher Kaynor were injured when a vehicle driven by 17-year-old Nicholas Farline

struck their vehicle. Later, Mr. Kaynor died of his injuries. Based on the family car doctrine, Ms. Kaynor filed a claim for wrongful death and personal injury against Nicholas's divorced parents, Bruce Farline and Karen Dahl-Green. The trial court granted summary judgment in favor of Nicholas's parents, concluding that the family car doctrine did not apply because (1) there was no evidence that Ms. Dahl-Green owned, maintained, or provided the vehicle driven by Nicholas, (2) Nicholas resided with his mother and was not a member of Mr. Farline's household, and (3) the vehicle was provided for Nicholas's exclusive use and was not intended to be a family car. Ms. Kaynor appeals, contending the evidence creates factual issues as to each element of the family car doctrine. We agree, reverse the summary judgment orders, and remand for trial.

## FACTS

In March 1999, Corissa Kaynor and her husband, Christopher Kaynor, were injured in an automobile collision that occurred on Interstate 90 near Moses Lake, Washington. Mr. Kaynor's injuries proved fatal. The vehicle that struck the Kaynor vehicle was driven by 17-year-old Nicholas Farline. The collision occurred when Nicholas fell asleep, or lost attention, while returning to Spokane after attending a high school basketball tournament near Tacoma.

*Family status and residence.* Nicholas's parents are Bruce Farline and Karen Dahl-Green. Nicholas is their only child. Mr. Farline and Ms. Dahl-Green divorced in December 1985, when Nicholas was four years old. The dissolution decree provided for joint custody; Ms. Dahl-Green was given primary physical custody of Nicholas and Mr. Farline was granted liberal visitation. Under the decree, both parents were granted the right and authority to decide matters concerning Nicholas's health, education, religion, and well-being. Mr. Farline was ordered to pay child support. Two years after the decree was entered, Ms. Dahl-Green married Paul Green.

As a child, Nicholas lived with Ms. Dahl-Green, who resided in Spokane, but he frequently visited Mr. Farline, who resided in Coeur d'Alene, Idaho. Nicholas would visit with his father every Thursday, every other weekend, and over the summer. When Nicholas entered his teenage years, he continued to live with his mother in Spokane, but still saw his father on a regular basis. The Thursday visits proved difficult to maintain, but Mr. Farline and Nicholas continued the weekend and summer visits.

*Purchase and maintenance of the vehicle.* At the time of the accident, Nicholas was driving a 1985 Jeep Wagoneer. The vehicle was purchased in Oldtown, Idaho, on Nicholas's 17th birthday—June 17, 1998. Mr. Farline and Nicholas had selected this 1985 Jeep Wagoneer after looking at a number of other vehicles.

Nicholas, Mr. Farline, and Mr. Farline's parents, Lou and Ruth Farline, were present at the time of the purchase. Nicholas stated that he paid one-half of the purchase price and that his father paid the other one-half. Mr. Farline stated that the money for the vehicle came from him but that: "Part of it I had put away for Nick, that I told him it's his money, he could do what he wanted to do with it." Clerk's Papers (CP) at 141. Mr. Farline further stated that he put this money aside for Nicholas in exchange for Nicholas obtaining a 3.0 grade point average. Mr. Farline's parents may have assisted their son by contributing to his portion of the purchase price.

At the time of the purchase, Nicholas and his father discovered that the Jeep could not be titled in Nicholas's name due to his age. They further discovered that a Washington title to the vehicle could not be placed in Mr. Farline's name because he resided in Idaho. Nicholas solved this problem by telephoning his mother and asking if title to the vehicle could be placed in her name. Ms. Dahl-Green and her husband Paul Green were not involved in plans to purchase the vehicle. In fact, Paul Green stated that he was not in favor of the purchase of a vehicle for Nicholas. In spite of these reservations, Ms. Dahl-Green agreed that the

vehicle could be titled in her name. The bill of sale showed Nicholas as the sole purchaser of the vehicle.

For the first few months, Ms. Dahl-Green provided automobile insurance on the vehicle. But after Nicholas was involved in two automobile accidents, causing her insurance carrier to issue a notice of cancellation, she removed the vehicle from her automobile insurance. Thereafter, Mr. Farline obtained and paid for Nicholas's automobile liability insurance. Nicholas did not pay for any insurance on the Jeep.

Nicholas's other automobile expenses were divided unevenly between his two parents. Mr. Farline, and possibly his father Lou Farline, paid for the Jeep's repairs. Ms. Dahl-Green purchased studded snow tires for the Jeep. In the main, Nicholas paid for gasoline for the Jeep. Sometimes, Mr. Farline would pay to have the tank filled when Nicholas was spending weekends in Idaho. Ms. Dahl-Green remembers paying for the Jeep's gasoline on only one occasion.

*Use of the vehicle.* Nicholas obtained his driver's license about six months before the Jeep was purchased. Prior to obtaining the Jeep, Ms. Dahl-Green or a friend would drive Nicholas to school and work. Nicholas used Ms. Dahl-Green's Honda or Mr. Green's Subaru for dates and, on occasion, Nicholas would drive the Honda to work. Before the Jeep was purchased, Mr. Farline would drive into Spokane to pick up Nicholas or Ms. Dahl-Green would drive Nicholas halfway. After the Jeep was purchased, Nicholas drove himself to his activities, school, work, and visitations at his father's home in Idaho.

Mr. Farline drove the Jeep on only one occasion, using the vehicle to get groceries. Mr. Farline also occasionally rode in the Jeep while Nicholas drove. A few times, Nicholas drove Mr. Farline to the lake so that Mr. Farline could use his wave runner. While Mr. Farline used the wave runner, Nicholas went somewhere else in the Jeep and then returned to pick up Mr. Farline. Mr. Green drove the Jeep on one occasion to move it so that he could sweep the driveway.

Ms. Dahl-Green never drove the Jeep, but Nicholas used the Jeep to haul plants and a chipper/shredder for her. Neither Ms. Dahl-Green nor Mr. Green had keys to the Jeep.

*Nicholas's driving privileges.* Mr. Farline testified that Nicholas did not need permission to use the Jeep for his everyday activities. But Nicholas would ask for permission to take long trips when he was staying with his father. Specifically, Nicholas asked for permission to drive on camping trips to Priest Lake. Mr. Farline testified that he was more lenient than Ms. Dahl-Green and that Nicholas would ask him for permission to do things after Ms. Dahl-Green had refused permission. Mr. Farline stated: "And sometimes he would use me against his mom. I let him go." CP at 128.

Ms. Dahl-Green stated in her affidavit that:

> The Wagoneer was Nick's car. Nick drove the Wagoneer wherever he went, which usually was to and from school and to and from his girlfriend's home. I never gave permission to Nick to drive the Wagoneer, since permission was not mine to give.

CP at 30-31.

However, Ms. Dahl-Green did exercise some control over Nicholas's use of the Jeep. Nicholas obtained the Jeep on June 17, 1998. In August, Nicholas was involved in two accidents—one while driving Ms. Dahl-Green's Honda and the second while driving the Jeep. At that point, Ms. Dahl-Green suspended his driving privileges on all vehicles for one month, and suspended his driving privileges on her Honda permanently. About a month later, Ms. Dahl-Green reinstated his privileges on the Jeep. However, during this period, she received the notification that her insurer was suspending or canceling Nicholas from her policy and she removed the Jeep from her policy. The collision with the Kaynor vehicle occurred on March 13, 1999, when Mr. Farline was providing automobile insurance for Nicholas.

*Trip to Fife.* In March 1999, Nicholas called Mr. Farline to discuss the trip to Fife, which is near Tacoma. Nicholas's

high school's basketball team was playing in a tournament there and Nicholas wanted to take Mr. Farline's 1998 Subaru on the trip. Mr. Farline informed Nicholas that he was not insured on the Subaru and reassured Nicholas that the Jeep would make the trip over to Fife. Nicholas asked Mr. Farline's permission to go on the trip and Mr. Farline gave Nicholas permission to go. In his deposition, Mr. Farline indicated that he thought Nicholas would not have driven to Fife without his parents' permission. Mr. Farline also testified that prior to the trip to Fife, Nicholas had never driven the Jeep on a trip of that length without first getting Mr. Farline's permission.

Ms. Dahl-Green testified that Nicholas did not ask her for permission to go to Fife; she explained that she had been out of town and did not speak to Nicholas until 10:00 P.M. the night before Nicholas intended to leave on the trip. At that time, Nicholas informed her about the details of the trip, including the names of the friends accompanying him, where he would be staying, and the arrangements he had made concerning his classes and soccer practice. Ms. Dahl-Green conceded that when she told Nicholas he could go, she understood that he would be driving the Jeep. The night before the fatal collision, Nicholas was arrested by the police in Fife.

*Litigation.* Ms. Kaynor filed a lawsuit for personal injuries and wrongful death naming Nicholas Farline, his parents, and his stepfather as defendants. Ms. Kaynor settled her action against Nicholas for his minimal insurance limits of $50,000. The parties later stipulated to the dismissal of Nicholas's stepfather.

Mr. Farline and Ms. Dahl-Green filed motions for summary judgment arguing that they were not liable under the family car doctrine. The court granted summary judgment in favor of Mr. Farline, concluding that the family car doctrine did not apply because (1) the vehicle driven by Nicholas was not provided or maintained by Mr. Farline for the customary conveyance of members of his household, and (2) Nicholas was not a member of Mr. Farline's house-

hold. The court granted summary judgment in favor of Ms. Dahl-Green, concluding that she did not own, maintain, or provide Nicholas's vehicle. The court denied Ms. Kaynor's motion for reconsideration. Ms. Kaynor appeals.

## ANALYSIS

STANDARD OF REVIEW. When reviewing an order granting summary judgment, this court undertakes the same inquiry as the trial court, considering all facts and reasonable inferences in the light most favorable to the nonmoving party. *Kahn v. Salerno*, 90 Wn. App. 110, 117, 951 P.2d 321 (1998). Once the moving party has established that there is no dispute as to any issue of material fact, the burden shifts to the nonmoving party to establish the existence of an element material to its case. *Id.* If the nonmoving party then fails " 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' " then the court should grant the motion. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

THE FAMILY CAR DOCTRINE. The family car doctrine was adopted in Washington in *Birch v. Abercrombie*, 74 Wash. 486, 133 P. 1020 (1913). "The doctrine is an extension of the rules of agency to a situation where public policy demanded relief to injured persons caused by the negligent operation of automobiles by members of families." *Pflugmacher v. Thomas*, 34 Wn.2d 687, 690-91, 209 P.2d 443 (1949). As explained in *Davis v. Browne*, 20 Wn.2d 219, 229, 147 P.2d 263 (1944), the doctrine establishes:

> [T]hat one who furnishes a vehicle for the customary convey-ance of the members of his family, whether for business or solely for pleasure, makes the transportation of such persons by that vehicle his affair, that is, his business, and anyone driving the vehicle for that purpose with his consent, express or implied, whether a member of his family or another, is his agent.

Stated differently, liability under the family car doctrine is based on agency principles and the members of the family who are permitted to drive the automobile are viewed as the agents of the owners if it is established that they were using the vehicle in furtherance of a family purpose for which it was maintained. *Cameron v. Downs*, 32 Wn. App. 875, 880-81, 650 P.2d 260 (1982).

Liability under the family car doctrine is not based on family relationship but, instead, is based on the relation of agency or service. *Warren v. Norguard*, 103 Wash. 284, 287, 174 P. 7 (1918). To some extent, Washington courts have been reluctant to acknowledge that the family car doctrine is also an instrument of policy, " 'a transparent device intended to place the liability upon the party most easily held responsible.' " *Cameron*, 32 Wn. App. at 881 n.1 (quoting WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 73, at 483 (4th ed. 1971)). But these two concepts are not mutually exclusive. The family car doctrine is based on an underlying policy, but liability is determined by application of agency principles.

█ In *Cameron*, Division One of this court concluded that a parent is liable for the negligent conduct of a family member under the family car doctrine if the plaintiff establishes that:

> (1) the car is owned, provided or maintained by the parent (2) for the customary conveyance of family members and other family business (3) and at the time of the accident the car is being driven by a member of the family for whom the car is maintained, (4) with the express or implied consent of the parent.

*Cameron*, 32 Wn. App. at 879-80. Consequently, we shall apply each element of *Cameron* to the facts of this case.

██ *The Car is Owned, Provided, or Maintained by the Parent.* To establish liability on the part of a parent under the family car doctrine, the plaintiff must first show that the parent owned, provided, or maintained the automobile in question. *Id.* Registration of the automobile in the name

of the parent establishes a rebuttable presumption of ownership. *Coffman v. McFadden*, 68 Wn.2d 954, 958, 416 P.2d 99 (1966). When determining whether a vehicle is owned by an unemancipated minor child residing at home or by his parents, the following elements must be considered:

> (a) Who paid for the car, (b) who had the right to control the use of the car, (c) the intent of the parties who bought and sold the car, (d) the intent of the parents and the child relative to ownership, (e) to whom did the seller make delivery of the car, (f) who exercised property rights in the car from the date of its purchase to the date of the accident, and (g) any other circumstantial evidence which may tend to establish the fact of ownership. *Jerdal v. Sinclair*, 54 Wn.2d 565, 342 P.2d 585 (1959).

*Coffman*, 68 Wn.2d at 958-59. Consequently, Ms. Kaynor must establish that either Ms. Dahl-Green or Mr. Farline —or both—owned, provided, or maintained the Jeep driven by Nicholas.

*Ms. Dahl-Green.* The trial court concluded that Ms. Dahl-Green was entitled to summary judgment because there is no evidence, except for the title, establishing that she owned, maintained, or provided the vehicle for Nicholas. We agree that Ms. Dahl-Green's status as the registered owner of the Jeep is clearly rebutted when we consider the factors identified in *Coffman*. The undisputed facts demonstrate that Ms. Dahl-Green did not contribute to the purchase of the Jeep, was unaware of its purchase until after the price had been negotiated, and did not accept delivery of the vehicle. But, there is evidence indicating the Ms. Dahl-Green provided or maintained the Jeep for Nicholas. She allowed the vehicle to be titled in her name and permitted her son to keep the vehicle at her house. She provided her son with a set of snow tires and she provided insurance for Nicholas on her own policy for two months.

*Mr. Farline.* The trial court concluded that Mr. Farline was not the owner of the Jeep as a matter of law, but that there was a genuine issue of material fact as to whether Mr. Farline provided and maintained the vehicle. While we

agree with the trial court that there is a question of fact as to whether Mr. Farline provided or maintained the vehicle, there may also be a question of fact as to whether Mr. Farline owned the vehicle.

Questions of fact concerning the issue of ownership were also addressed in *Coffman* and *Hulse v. Driver*, 11 Wn. App. 509, 524 P.2d 255 (1974). In *Coffman*, a son and his father went to the car lot together, the son provided $75 of the $260 purchase price, the father paid the insurance, and both the father's name and the son's were on the certificate of title. *Coffman*, 68 Wn.2d at 957. The court concluded that these facts were sufficient to raise an issue of fact as to the ownership of the vehicle. *Id.* at 959. In *Hulse*, the father wrote a check to purchase the cashier's check used to purchase the vehicle; the father accompanied the son when the vehicle was purchased, the father advised the son that the vehicle was sound, the mother paid the insurance, and both parents had driven the vehicle on three or four occasions. *Hulse*, 11 Wn. App. at 516. The *Hulse* court found a question of fact as to whether the parents owned or provided the vehicle even though the parents and the son testified that title was in the son's name and that the son had reimbursed his parents for all payments made with respect to the vehicle. *Id.* at 517.

Based on the record here, there is an issue of fact as to whether Mr. Farline owned, provided, or maintained the automobile in question. Based on the record here, there is an issue of fact as to whether Ms. Dahl-Green provided or maintained the automobile.

■ *For the Customary Conveyance of Family Members and Other Family Business.* The second element of the family car doctrine has been described in slightly different ways by different courts. *Cameron* requires a showing that the vehicle was "for the customary conveyance of family members and other family business." *Cameron*, 32 Wn. App. at 880. In *Pflugmacher*, the Washington Supreme Court concluded that the family car doctrine required a showing that the defendant owner furnished the vehicle

"for the customary conveyance of the members or a member of his immediate family." *Pflugmacher*, 34 Wn.2d at 690. In *Coffman* and *Mylnar v. Hall*, 55 Wn.2d 739, 350 P.2d 440 (1960), the Supreme Court described the second element as requiring a showing that the vehicle was "for the general use, pleasure, and convenience of the family." *Coffman*, 68 Wn.2d at 958 (citing *Mylnar*, 55 Wn.2d at 745).

*Family purpose.* Nicholas's parents argue that summary judgment was proper because there is no showing that the Jeep was provided for the use of multiple family members. In other words, they believe a vehicle is not maintained for a family purpose unless the vehicle is provided for the use of multiple family members.

There is little to support the argument that the family car doctrine is inapplicable absent a showing of a family purpose that includes use by multiple family members. While the *Cameron* court refers to "the customary conveyance of family members and other family business,"[1] the *Pflugmacher* court refers to "the customary conveyance of the members or a member of his immediate family."[2] More precisely, the *Coffman* and *Mylnar* courts require a showing that the vehicle is used for the "general use, pleasure, and convenience of the family."[3]

*Coffman* is particularly instructive. There, the Supreme Court found an issue of fact sufficient to invoke the family car doctrine where there was no evidence that the vehicle was intended for use by multiple family members. In *Coffman*, William, a high school student, "desired to have an automobile of his own to transport him to and from his employment." *Coffman*, 68 Wn.2d at 957. As a result, William and his father purchased a vehicle with money contributed by William and his parents. Unfortunately, within a week after taking delivery of the vehicle, William had an accident while on a pleasure trip. Prior to the

---

[1] *Cameron*, 32 Wn. App. at 880.

[2] *Pflugmacher*, 34 Wn.2d at 690.

[3] *Coffman*, 68 Wn.2d at 958; *Mylnar*, 55 Wn.2d at 745.

accident, the vehicle had never been driven by any member of the family except William. Significantly, William's father testified that the vehicle had been purchased for William's exclusive use and benefit. *Id.*

Because the family car doctrine applies agency principles, the parents define the purpose of each family vehicle based on the needs of each particular family. Consequently, a parent is free to determine that one, or perhaps a limited number of family members, is authorized to do specific errands with a specific vehicle. In sum, the issue as to what constitutes general use, pleasure, and convenience of a family is a question of fact that may change from family to family depending on the needs of the family and the authorization granted by the parent or parents.

Here, there is substantial evidence indicating that Nicholas's exclusive use of the Jeep for transportation to school, work, and visitation with his father provided a great convenience to both of his parents. Additionally, the fact that other family members did not often drive or ride in the vehicle is of limited significance where Nicholas was an only child, and his mother, father, and stepfather each had their own vehicles. In short, whether a vehicle is provided for the "general use, pleasure, and convenience of the family" is not determined by the number of drivers using the vehicle. Rather, courts apply agency principles.

*Evidence of exclusive use.* In a similar vein, Nicholas's parents maintain that a showing of exclusive use and exclusive benefit by one driver bars the application of the family car doctrine. They argue that the family car doctrine is inapplicable here because the Jeep was provided for Nicholas's exclusive use to meet his transportation needs. To support this argument, Nicholas's parents rely on the holding in *Hulse*.

In *Hulse*, Mr. and Mrs. Driver, and their son, Michael Driver, testified that Michael had reimbursed his parents for their payments for the vehicle and that the vehicle had been under Michael's exclusive control and was used by other family members only with his express permission.

*Hulse*, 11 Wn. App. at 517. The court concluded that the record raised an issue as to whether the parents owned or provided the automobile for their son, but that the record contained "no evidence, or inference, that the automobile was for the general use, pleasure, and convenience of the family, as is necessary for application of the family car doctrine." *Id.* The court stated:

> The affidavits and depositions show Michael's vehicle was used by other family members on only three or four occasions during the 8- or 9-month period from the time he purchased the vehicle until the accident in question. *Each such use was with Michael Driver's express permission or for his own benefit.*

*Id.* (Emphasis added.)

Given the limited facts set forth in *Hulse*, it is difficult to compare Michael Driver's use of his vehicle with Nicholas's use of the Jeep. However, the evidence in *Hulse* indicates that Michael had exclusive use and control of the vehicle and that he was not under either parent's control when he used the vehicle. Unlike the evidence here, there are no facts in *Hulse* showing that Michael's authority was limited or that his parents had provided the vehicle to alleviate family transportation problems. Hence, the lesson from *Hulse* appears to be that a child's exclusive use of a vehicle—coupled with a showing that the child had exclusive control of the vehicle—bars the application of the family car doctrine. This makes sense. The vehicle cannot be maintained for a family purpose if the parent has no control over the use of the vehicle or the activities of the driver.

Here, the evidence indicates that while Nicholas may have been the exclusive driver of the Jeep, he did not exercise exclusive control over the use of vehicle. Instead, the evidence indicates that the Jeep was provided for Nicholas so that he could assist his parents by transporting himself to his daily activities and visitations with his father in Idaho. More importantly, the evidence indicates that Nicholas was required to obtain permission to take the vehicle on longer trips. By controlling Nicholas, his parents

arguably controlled and defined the use of the Jeep as a vehicle for the general use, pleasure, and convenience of both parents. In sum, Ms. Kaynor has provided sufficient evidence to raise a question of fact as to whether Nicholas's parents provided the Jeep for the general use, pleasure, and convenience of the family.

_At the Time of the Accident, the Vehicle is Being Driven by a Member of the Family for Whom the Vehicle was Maintained._ To establish liability under the family car doctrine, the plaintiff must show that, at the time of the accident, the vehicle was being driven by a member of the family for whom the car is maintained. The trial court concluded that this element of the family car doctrine was not met because Nicholas was not a resident of Mr. Farline's household. The trial court argued that the family car doctrine "is based not upon consanguinity, but upon agency," and that a residency requirement provided a useful litmus test to limit membership in the group of agents covered under the family car doctrine. CP at 256.

In reaching its conclusion, the trial court relied on _Warren_, 103 Wash. 284. In _Warren_, the parents' eldest son, who was financially independent and did not live at home, returned home one day and, finding the family absent, took the car from the garage and drove it around. After finding one of his brothers, the eldest son started driving back to the family residence, but hit a pedestrian on the way. _Id._ at 285-86.

The _Warren_ court acknowledged that liability under the family car doctrine was not based solely on family relationship, but, instead, was imposed based on the relation of agency or service. _Id._ at 287. Following this reasoning, the court concluded the son was driving without his parents' consent, there was no agency, and the vehicle was not being driven on any business or pleasure for the family. _Id._ The court stated: _"Not being a member of his parents' family_, he stood with relation to his parents as any stranger would stand." _Id._ (emphasis added). But the court earlier stated that: "It may be that the relation of agency or service will be

conclusively presumed, where the automobile is purchased for the use of a family all residing together in the common home, or where an adult child, not a part of the immediate family, drives it at the request of the parent, or on some business pertaining to the affairs of the parent." *Id*. In short, a careful reading of *Warren* does not support the addition of a residency requirement to the family car doctrine, especially where, as here, the driver was an unemancipated child.

This issue, whether the family car doctrine necessarily requires a resident child, was addressed in *McGinn v. Kimmel*, 36 Wn.2d 786, 221 P.2d 467 (1950). In *McGinn*, the parents acquired an automobile that was used by only the father and one of the four children, a son named John. John later left the family home for military service, returned from service, married, and established his own home. John and his wife did not own a vehicle, but would occasionally use the vehicle owned by John's family. On one occasion, John obtained permission from his father to use the vehicle for a trip to visit his wife's family. An accident occurred while John's family was on this trip. *Id*. at 788.

The court determined that the question presented was whether John was a member of his father's family such that he was an agent when making the pleasure trip to visit his wife's family. To reach its decision, the court quoted, with approval, the following language from *Carlson v. Wolski*, 20 Wn.2d 323, 147 P.2d 291 (1944):

> "The family group is not necessarily confined to persons related to the owner. It embraces all the members of the collective body of persons living in his household, for whose convenience the car is maintained and who have authority to use it."

*McGinn*, 36 Wn.2d at 788-89 (quoting *Carlson*, 20 Wn.2d at 332). Significantly, the *McGinn* court then concluded:

> It is not necessary for us at this time to say that this definition is all-inclusive, *as a family group might include a child who temporarily resided without the family roof* and was permitted to use the parents' automobile; but it is our opinion

that, when a child leaves the family circle and establishes a home of his own, he ceases to be a member of the family within the meaning of the family purpose doctrine; and when he uses his parents' automobile with their consent and for his own pleasure, he is a borrower of it and not an agent.

*McGinn*, 36 Wn.2d at 789 (emphasis added).

Read together, *Warren* and *McGinn* suggest that a residency requirement is inappropriate when applying the family car doctrine to a situation involving a driver who is an unemancipated child. The question of whether the family car doctrine applies is resolved by applying agency principles, not residency requirements. An unemancipated child living away from one or both parents may be an agent of the family for purposes of the family car doctrine if it is shown that the child was authorized to use the vehicle, and that the child was using the vehicle, with the parent's consent, for a family purpose. Hence, facts related to residency, like facts related to emancipation and control, are only one of several factors to consider when determining whether the family car doctrine applies. The real test is whether the unemancipated child, regardless of residency, was using the vehicle, with the parent's express or implied consent, for the family purpose for which the vehicle was provided.

Here, there is no question that Nicholas was unemancipated at the time of the accident and that both Ms. Dahl-Green and Mr. Farline considered Nicholas to be a member of their respective families.

*With the Express or Implied Consent of the Parent.* Under the fourth prong of the family car doctrine, the plaintiff must show that, at the time of the accident, the driver was using the vehicle with the express or implied consent of the parent.

The testimony is more than sufficient to raise a question of fact as to whether Mr. Farline and Ms. Dahl-Green had control over Nicholas's use of the Jeep and whether he was using the vehicle with their consent at the time of the accident. The testimony showed that Nicholas needed a

parent's permission to go to the basketball tournament and that on previous occasions he had requested permission from his father in order to take longer trips in the Jeep.

The orders granting summary judgment and dismissing Ms. Kaynor's lawsuit are reversed and the case is remanded for trial.

Brown, C.J., and Schultheis, J., concur.