IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68915-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KEAYN DUNYA, | ) | |
| | ) | |
| Appellant. | ) | FILED: January 20, 2015 |

SCHINDLER, J. — A jury convicted Keayn Dunya of murder in the first degree of

Kriston Dunya. By special verdict, the jury found Dunya was "armed with a firearm at

the time of the commission of the crime." Dunya appeals, arguing (1) the DNA[1] testing

violated his right to due process, (2) the court erred in allowing expert testimony on

infrared video analysis and reverse projection photogrammetry, and (3) the jury verdict

did not authorize the imposition of a firearm enhancement. We affirm.

FACTS

Keayn and Kriston Dunya married and had a child together, K.D. In 2010,

Kriston filed for dissolution of the marriage. Kriston sought joint custody of K.D. and

child support. Dunya would not agree to entry of the final orders in the dissolution

action. The dissolution trial was scheduled to begin on July 28, 2011.

---

[1] Deoxyribonucleic acid.

Kriston worked at the Barnes & Noble store in Bellingham. On Saturday, July 2, 2011, Kriston and Amber Wilson worked the late shift at Barnes & Noble. Kriston and Wilson made plans to go for a walk on July 3. Kriston was scheduled to be off work the next day and return to work on July 4. Kriston left the store at approximately 11:30 p.m. On July 3, Wilson sent Kriston several text messages but received no response.

On July 4, Kriston did not come to work or answer her phone. That evening, Barnes & Noble supervisor Robinson Whitney drove past Kriston's apartment "to see if she was home." Whitney saw the "outdoor light" on and noticed Kriston's car parked in front of the building. When Kriston did not come to work on July 5, Whitney returned to Kriston's apartment. Whitney knocked but there was no response. Whitney then looked through a window and saw Kriston lying on the apartment floor. The door to the apartment was unlocked. Whitney opened the door and yelled Kriston's name. When Kriston did not respond, Whitney called 911.

The police found Kriston's purse near her body. The purse contained her identification and credit cards. Scattered around the floor near her body were Vicodin pills. The police also found fingertip pieces from a yellow rubber latex glove on the floor and a bullet embedded in the carpet near her body. Kriston did not have any prescriptions or bottles for Vicodin.

Detective Joseph Leighton met with Dunya on July 5. Dunya told Detective Leighton that he and his son K.D. were with his girlfriend Kara Buchanan at her home on Whidbey Island the entire July 4 weekend. Buchanan confirmed that Dunya had been with her the entire weekend. Buchanan told Detective Leighton that Dunya and

2

K.D. arrived Friday evening, July 1, and left around 4:00 or 5:00 p.m. on Monday, July 4.

The medical examiner determined that the single gunshot wound to the chest caused Kriston's death on July 3. The gunshot was from such close range that her face was "tattoo[ed]" with gunpowder.

The police obtained surveillance videotapes from several nearby locations. The video from an adjacent building showed that during the early morning hours of July 3, a Toyota Avalon drove past Kriston's apartment and parked in a lot nearby. The Toyota Avalon has a sunroof and an American flag decal on the left side of the rear bumper. The right auxiliary light of the car is out and the driver's door mirror is broken off.

At approximately 4:51 a.m., a person gets out of the Toyota Avalon, puts on a jacket, and grabs an object that appears to be a long barrel gun. The jacket has a hood and two vertical stripes running from the neckline down the outer portion of the sleeves to the cuffs. At approximately 4:53 a.m., the person walks toward Kriston's apartment holding what appears to be a long barrel gun on the right side. Three minutes later at approximately 4:57 a.m., the same person returns carrying the long barrel gun, gets into the Toyota Avalon, and drives away.

On July 7, Buchanan called and left a voicemail for Detective Leighton. In the message, Buchanan tells Detective Leighton that she shot Kriston and provides details of the shooting that had not been released to the public. Buchanan states that she plans to kill herself.

After receiving the voicemail, Detective Leighton contacted Island County police. The Island County police found Buchanan at a beach on Whidbey Island with an empty

3

pill bottle of Vicodin and bleeding profusely from cuts to her wrists. An extra-large hooded red jacket with stripes on both sleeves was in the backseat of Buchanan's Dodge Durango. In the ambulance on the way to the hospital, Buchanan told Detective Jana Bouzek that she did not harm Kriston and that she had never been to Kriston's apartment.

Police searched Buchanan's residence. A gold Toyota Avalon that matched the vehicle in the surveillance video was parked in the carport at Buchanan's home. During a search of the house, police found a long barrel 20-gauge pump shotgun, a 20-count package of yellow rubber latex gloves with one glove missing, and a bag of burnt plastic debris.

On July 13, the State charged Dunya and Buchanan with the first degree murder of Kriston while armed with a firearm. The police obtained DNA samples from both Dunya and Buchanan.

On July 15, Dunya's attorney filed a "Notice of Appearance, Demand for Discovery, Not Guilty Plea and Demand for Jury." The Notice of Appearance requests copies of all police records, witness statements, police notes, "copies of any reports or laboratory or fingerprint tests, autopsy reports, photographs and breathalyzer or blood test," and "all documents, writings and things that are evidence." The Notice of Appearance also asked for "a list of all persons . . . having knowledge or information concerning the incident(s)[,] any and all search warrants, supporting affidavits, and returns executed in the investigation," and "notice before any evidence or potential evidence relating to the above action is released by the Plaintiff or destroyed or before any testing of said evidence occurs."

The Washington State Patrol Crime Laboratory (WSPCL) determined that the weapon used to kill Kriston was likely a 12-gauge shotgun. Toxicology reports found no drugs or alcohol in her system at the time of death.

On August 30, WSPCL forensic scientist Mariah Low informed Bellingham Police Department Evidence Superintendent Les Gitts that she had obtained a very small amount of DNA from two of the yellow latex glove pieces found near Kriston's body. Low told Superintendent Gitts that she believed she could extract a DNA profile but the test would likely consume the entire sample. Following WSPCL protocol, Low requested authorization to perform the DNA testing.

On September 7, 2011, the prosecutor sent a written response authorizing Low to perform DNA testing.

> I am writing about the [State v. Dunya & Buchanan] case and evidence that has been sent to your laboratory for examination. In speaking with Sergeant Les Gitts he has indicated that the following items cannot be examined for DNA without potentially consuming the samples:
> 1. Shotgun # 100140
> 2. Pieces of rubber/latex gloves #100067
> 3. Gloves # 100332
> 4. Blood
> I would ask you to go ahead with your analysis, notwithstanding the fact that the samples may be consumed in the process.

On October 10, the WSPCL issued a report on the DNA testing. The glove pieces contained a mixed sample of DNA from at least two people. The DNA profile of Dunya matched the profile of the major contributor of the DNA on the glove pieces. There was not enough information to determine the minor contributor. The WSPCL produced copies of all documentation related to the DNA testing and analysis to the defense.

5

The defense filed a motion to suppress the DNA evidence. Dunya argued the prosecutor's failure to notify the defense that the test would result in consumption of the entire DNA sample violated his right to due process.[2] The prosecutor submitted an affidavit stating that his failure to notify the defense of the DNA testing was an unintentional "oversight."

The court found "no showing of bad faith" and denied the motion to suppress. However, the court ruled that the defense could "inquire thoroughly about the circumstances" concerning the DNA testing at trial.

Before trial, Buchanan pleaded guilty to the lesser charge of rendering criminal assistance in the first degree and agreed to testify against Dunya.

The State called approximately 18 witnesses to testify at trial. The court admitted into evidence more than 100 exhibits, including video clips and stills from the surveillance tapes, evidence seized at the crime scene and during the search of Buchanan's house, phone records, and the voicemail from Buchanan to Detective Leighton confessing that she killed Kriston. The defense theory was that Buchanan or an unknown person killed Kriston.

Nancy Parker lived in the apartment above Kriston. Parker testified that in the early morning hours of July 3, she heard "a male voice mumbling for a couple minutes, . . . a very brief scream and then . . . a bang-bang that at that time I thought was a door slamming." Parker testified that after the "bang-bang" noise there was silence.

---

[2] Dunya also argued the prosecutor's failure to notify the defense before authorizing the DNA testing violated the WSPCL policies and procedures. However, there was no dispute the WSPCL followed adopted policies and procedures before conducting DNA testing.

Detective Richard Schwallie testified about the police investigation and the video obtained from the surveillance cameras located at the adjacent building. Detective Schwallie explained that because of the lack of ambient light in the early morning hours of July 3, the cameras were in "night mode" and used "an infrared illuminator and infrared filter to capture the images." Detective Schwallie testified about his experience with infrared imaging. Detective Schwallie said infrared mode "throws out the color component," resulting in "a distortion of tone."

The court admitted into evidence video clips and still shots of the individuals in the surveillance video. Detective Schwallie testified that the person shown in the surveillance video at approximately 5:00 a.m. on July 3 appeared "to have a darker complexion" compared to other people captured on the surveillance video earlier that morning or the night before.

Detective Schwallie testified that he used reverse projection photogrammetry to determine the height of the person in the video. Buchanan was approximately 5 feet 3 inches tall and Dunya was approximately 5 feet 10 inches tall. Using the same cameras at the same location and camera angle, Detective Schwallie recorded a female officer between 5 feet 3 inches and 5 feet 4 inches tall, and a male officer who was 5 feet 10 inches tall. Detective Schwallie testified that the height of the person in the video on July 3 was "closer to five foot ten and . . . definitely appeared to be a larger body build than our 5-foot four female." The court admitted into evidence still shots from the cameras showing the height of the two officers as compared to the person in the video. The still shots are superimposed over images of the person in the video.

Detective Michael Mozelewski testified that Whidbey Island is located approximately 87 miles from Bellingham and it takes approximately one hour and 54 minutes to drive from Whidbey Island to Bellingham.

Amber Wilson testified that Kriston was seeking custody of K.D. and that Kriston wanted to move back to Missouri with her son. The attorney representing Kriston in the dissolution action testified that Dunya objected to the order of child support and "refused to sign" any temporary orders.

Buchanan testified that she met Dunya in August 2010 and they began dating in April 2011. Buchanan said she went to Bellingham every Wednesday to spend the night with Dunya and he would come to her house on Whidbey Island on "various weekends," often with his son K.D. Buchanan said Dunya told her he had been divorced for several years. Buchanan said she was in love with Dunya.

Buchanan testified that in late May or early June 2011, Dunya described his "dark side" and said that "he was going to kill his wife." Buchanan said she did not "take him seriously."

Q. Did he ever mention that he would be doing something to Kriston Dunya, his wife, or he led you to believe his ex-wife?
A. Um, there was once earlier in the relationship when we were driving down the Island, we were talking about personality traits and he mentioned he had a dark side, if I couldn't handle it, don't ask about it. And I sort of shrugged my shoulders and rolled my eyes and I said, okay, I can deal with it. Tell me what it is. And he said he was going to kill his wife and I just laughed it off. I didn't think anything of it.
Q. Did you take him seriously at that point at all?
A. Not in that regard, no.

Buchanan said that Dunya and K.D. spent the July 4 holiday weekend with her on Whidbey Island. But Buchanan testified that when she woke up around 3:00 a.m. on

July 3, Dunya was not in bed. When Buchanan got up around 6:00 a.m., Dunya still "wasn't there" and she noticed that his cell phone was on the nightstand. Buchanan checked on K.D. and then went outside. Buchanan said Dunya's truck was parked outside but her gold Toyota Avalon "was gone." Buchanan testified that Dunya had never taken her car before and had not mentioned anything about leaving early in the morning.

After Buchanan went back inside, she checked Dunya's cell phone and discovered "text messages from multiple women." Buchanan said it appeared that Dunya "had multiple relationships other than ours." Buchanan was upset and called her husband in Minnesota to tell him she thought her relationship with Dunya was over. The cell phone records show that at 6:22 a.m. on July 3, Buchanan called a number in Minnesota. The call from Buchanan on Whidbey Island to her husband in Minnesota lasted 25 minutes.

Buchanan testified that Dunya returned later that morning driving her Toyota Avalon. Dunya parked the car in the carport. Buchanan testified that Dunya put her red jacket with stripes on the sleeves into the washing machine. Shortly after Dunya returned, Buchanan saw him next to the Toyota with his left hand on the trunk of the car and his right hand holding a five-gallon bucket wrapped in a clear garbage bag. When Dunya saw Buchanan, he told her to "get back in the house." Buchanan watched from the window as Dunya took the bucket and a fire extinguisher to the backyard. After Dunya and K.D. left the next morning, Buchanan found a burn spot in the grass and a hard piece of plastic.

9

On July 6, Buchanan drove to Dunya's apartment in Bellingham to take care of K.D. while Dunya was at work. After she received a call from the Bellingham Police Department, she immediately sent Dunya a text message. In the text, Buchanan asked Dunya why the police wanted to talk to her. Dunya responded that the police wanted Buchanan to "confirm that he was with [her] that weekend" and that she "was to let them know that he was."

On July 7, Buchanan decided to call Dunya and confront him about seeing other women.

> I said give me a detail. Keayn give me a detail. What happened. And instead of telling me he was having an affair, what he said was single shot to the chest, blood splatter all over the apartment. And I don't remember ending the conversation on the phone.

Buchanan testified that after the call, she went home, "grabb[ed] my pills and an Exacto knife," drove to the beach, and swallowed 90 Vicodin pills.[3] After taking the Vicodin, Buchanan called Detective Leighton and confessed to killing Kriston. Buchanan said that she confessed because she did not want K.D. to grow up without a father and K.D. "was [her] only concern at that point." Buchanan explained that in order to convince the police she had killed Kriston, she included as many details as she could remember based on what she observed, what Dunya had told her, and the questions the police had asked her.

On cross-examination, Buchanan stated that she had "an aspect of [her] personality" she referred to as "monster" that "comes out to protect [her] inner child." Buchanan testified that she sometimes referred to her "monster" in conversations and text messages with Dunya and others but did not remember talking to the police about

---

[3] Buchanan testified she had a Vicodin prescription for chronic plain and had shared her medication with Dunya after he told her he had been in a car accident.

it. But Buchanan said there was "no way monster could hurt anybody" because "[m]onster is a protector not a danger."

Emily Mowrey dated Dunya from April 2010 to May 2011. Mowrey testified that Dunya told her he had been divorced for several years and he was in a custody dispute with Kriston.

Shellie Stevens testified that she dated Dunya off and on for approximately five years. Stevens said Dunya told her he was divorced. Stevens testified that after Kriston's murder, Dunya sent her a text message saying the newspapers were wrong and he and Kriston were not married. Stevens testified that in May 2011, Dunya told her he was concerned Kriston would get custody of K.D. and take K.D. back to Missouri. According to Stevens, Dunya said "something about . . . Kriston needing to die or . . . needing to kill her." Stevens gave Dunya a hug and told him he "could never do that." In response, Dunya said, "I have to."

Before Low testified, the parties entered into a written stipulation concerning the authorization to conduct DNA testing on the latex glove pieces. The stipulation states:

> Ms. Low will testify that she notified the Bellingham Police Department and the Whatcom County Prosecuting Attorney's Office that testing for DNA in the pieces of latex glove found in the apartment of Kriston Dunya would consume any DNA that was available on those pieces of evidence. She received a letter from the Prosecuting Attorney's Office authorizing her to conduct the test for any available DNA. She assumed that this information of the consumption of any available DNA would be passed on to the defense attorney, and now understands that this notification was not brought to the attention of [defense counsel].

Low testified that she extracted DNA from the pieces of the rubber latex glove but the quantity of the DNA was "very low," only .102 nanograms. Because the DNA testing would consume the entire sample, she sought authorization before proceeding. Low

11

testified that the prosecuting attorney authorized her to conduct the DNA testing. Low assumed the defense was notified because "whenever we are going to consume more than half of an evidence item," it is laboratory policy to "allow a defense hired individual to come in and observe that testing if they so chose to do that."

Low testified that she generated over 100 pages in notes, photos, and other documentation concerning the DNA testing to allow a forensic expert to review her notes and see exactly what she did. Low testified that the DNA test of the sample extracted from the glove pieces generated a mixed profile, meaning "it came from at least two individuals." Low compared the DNA profile to the reference samples taken from Dunya and Buchanan. Low determined that the DNA profile matched the DNA profile for Dunya. Low stated that the probability of finding someone else with the same DNA profile as she found on the glove pieces that matched Dunya was "one in 100 quintillion." Low testified that she was not able to make a comparison to the second "minor component" of the DNA profile.

The defense conducted an extensive cross-examination of Low and the procedures and methods used for the DNA testing and analysis. Low explained that because the DNA sample was so small, she had to "amplif[y]" the sample by making copies of the DNA to reach 1.02 nanograms. Low also testified that the "reagent blank," a separate tube that is processed along with the sample to detect contaminates, indicated the presence of contaminant DNA but it was such a low level of contaminant, it was not possible to determine the source. Low testified that the contaminant had "no [e]ffect on the results."

12

Low also testified about DNA testing performed on the red jacket recovered from Buchanan's car. Low stated there were at least two contributors to the DNA and one contributor was male. Low was able to exclude Dunya as a possible contributor to the DNA profile on the jacket. Low testified she could not exclude or include Buchanan as a possible contributor.

Dunya did not testify. The defense called two witnesses, the police officer who rode with Buchanan to the hospital after the suicide attempt, Detective Bouzek, and Dr. Donald Riley.

Detective Bouzek testified Buchanan said that "she didn't harm Kriston," and that "she hadn't been to [Kriston's] home and she hadn't seen her that previous weekend." But when Detective Bouzek asked Buchanan "whether or not monster hurt [Kriston]," Buchanan said that "the monster might have or could have hurt [Kriston], but she would like to think that she didn't hurt anyone."

Dr. Riley testified that based on his review of the DNA testing on the glove pieces, he did not "trust" the results. Dr. Riley stated Low's notes indicate that the DNA sample on the glove pieces and the reference sample from Dunya were probably stored together, and that could have contaminated the "very, very small" amount of DNA on the glove pieces. According to Dr. Riley, "the general assumption would be that the results are due to contamination."

In closing, the prosecutor argued the evidence established beyond a reasonable doubt that Dunya killed Kriston at approximately 5:00 a.m. on July 3 with a 12-gauge shotgun. The prosecutor asserted the evidence showed Buchanan could not have been in Bellingham at 5:00 a.m. because her cell phone established she was on Whidbey

13

Island at 6:22 a.m. The State also argued Buchanan was not the right height or build to be the person on the surveillance video and only Dunya had a motive to kill Kriston.

Defense counsel argued that the evidence showed Buchanan killed Kriston because she was "obsessed with having a life with [Dunya and K.D.]" Defense counsel argued that the physical evidence, particularly the DNA from the glove pieces, was not reliable. The attorney asserted the evidence showed the DNA evidence was likely contaminated. The attorney also argued the WSPCL violated its standard operating procedures by testing the evidence without notifying the defense.

The jury convicted Dunya of murder in the first degree. By special verdict, the jury found that Dunya was armed with a firearm at the time of the commission of the crime. The court imposed a standard range sentence of 320 months together with the firearm enhancement of 60 months.

## ANALYSIS

### DNA Testing

Dunya argues denial of his motion to suppress the DNA evidence violated his right to due process. Specifically, Dunya asserts the prosecutor's authorization to conduct the DNA testing precluded independent verification by the defense.

We review an alleged due process violation de novo. State v. Mullen, 171 Wn.2d 881, 893-94, 259 P.3d 158 (2011). Due process requires the State to preserve material exculpatory evidence. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3; California v. Trombetta, 467 U.S. 479, 485-89, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984); State v. Wittenbarger, 124 Wn.2d 467, 475, 880 P.2d 517 (1994) (citing Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)).

14

Whether destruction of evidence violates due process depends on the nature of the evidence and the motivation of law enforcement. Wittenbarger, 124 Wn.2d at 475-77 (citing Trombetta, 467 U.S. at 489; Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 281 (1988)). "Material exculpatory evidence" must possess "an exculpatory value that was apparent before it was destroyed" and be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Wittenbarger, 124 Wn.2d at 475 (citing Trombetta, 467 U.S. at 489).

By contrast, "potentially useful" evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Youngblood, 488 U.S. at 57; Wittenbarger, 124 Wn.2d at 477. For example, in Youngblood, the destroyed semen samples taken from the victim were only "potentially useful" because their exculpatory value was not apparent before testing. Youngblood, 488 U.S. at 56 n*.

The DNA extracted from the glove pieces was potentially useful not material exculpatory evidence. As in Youngblood, the DNA evidence had no apparent exculpatory value without testing.

In Youngblood, the police negligently failed to preserve semen samples collected from the victim and the victim's clothing. Youngblood, 488 U.S. at 58. Notwithstanding the State's negligence, the Court held that the defendant could not demonstrate the State acted in bad faith by destroying the potentially useful evidence and, therefore, there was no due process violation. Youngblood, 488 U.S. at 58.

The defendant has the burden of showing that the failure to preserve "potentially useful" evidence "was improperly motivated." Wittenbarger, 124 Wn.2d at 478. Where,

15

as here, the evidence is only "potentially useful" to the defense, the failure to preserve the evidence does not violate due process unless the defendant can show the State acted in bad faith. Wittenbarger, 124 Wn.2d at 477 (citing Youngblood, 488 U.S. at 58). Bad faith is shown when "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Youngblood, 488 U.S. at 58. Mere negligence is insufficient to establish bad faith. Youngblood, 488 U.S. at 58; United States v. Tercero, 640 F.2d 190, 193 (9th Cir. 1980). "Bad faith" in this context requires some showing of "connivance." United States v. Loud Hawk, 628 F.2d 1139, 1146 (9th Cir. 1979). Compliance with departmental destruction policies is evidence of good faith. See, e.g., United States v. Barton, 995 F.2d 931, 935-36 (9th Cir. 1993); United States v. Heffington, 952 F.2d 275, 280-81 (9th Cir. 1991); United States v. Westerdahl, 945 F.2d 1083, 1087 (9th Cir. 1991); Mitchell v. Goldsmith, 878 F.2d 319, 322 (9th Cir. 1989). But "the destruction of evidence . . . in violation of explicit policy and procedures . . . [does] not ipso facto establish bad faith." State v. Groth, 163 Wn. App. 548, 559-60, 261 P.3d 183 (2011) (citing United States v. Montgomery, 676 F. Supp. 2d 1218, 1245 (D. Kan. 2009); United States v. Elliot, 83 F. Supp. 2d 637, 647 (E.D. Va. 1999); State v. Durnwald, 163 Ohio App. 3d 361, 371, 2005-Ohio-4867, 837 N.E.2d 1234).

Below, the prosecutor admitted his authorization to conduct DNA testing without notifying the defense "was an oversight," and stated his "main purpose . . . was to get the testing concluded as soon as possible and obtain results for the State and the defense." The prosecutor's affidavit states, in pertinent part:

> Your affiant was involved in the investigation of the murder of Kriston
> Dunya and the subsequent charging of the [State v. Dunya & Buchanan]

16

matter. The investigation of the murder of Kriston Dunya immediately implicated Keayn Dunya and Kara Buchanan. Due to this fact, both were charged with Murder in the First Degree on July 13, 2011. At this time there had been no examination of evidence by the Washington State Patrol Crime laboratory. Evidence, including pieces of a latex glove found at the crime scene, a coat believed to have been involved and a shotgun, and various swabs taken from suspects for DNA analysis and swabs taken from the victim's body at the autopsy, were sent to the Laboratory on the 13th day of July, 2011.

I believed that it was critical to obtain the analysis of the items submitted as soon as possible in order to make a determination as to the culpability of the two people charged. Ms. Buchanan had admitted to the shooting, but there was concern as to what her involvement was in the murder and also the involvement of Mr. Dunya. We had a video tape that we believed showed Keayn Dunya approaching the building in which the victim was located with a long firearm, and also leaving the vicinity of the building within three minutes of arrival. I hoped that the laboratory analysis would provide further evidence to ascertain each of the Defendant's roles in this crime.

I received notice from Sergeant Les Gitts of the Bellingham Police Department that testing would not proceed with the latex glove pieces, the gun, or the glove, unless authorization by means of a "letter of consumption" was provided to the lab. I wrote Forensic Scientist Mariah Low a letter on September 7, 2011, authorizing the examination even though the sample might be consumed during the testing. On other occasions I have moved the court for an order authorizing this testing, but it was an oversight that I just sent a letter. If a case is under investigation I would ordinarily send a letter and if it was charged I would often seek a court order. The main purpose of sending the letter was to get the testing concluded as soon as possible and obtain results for the State and the defense.

Dunya's attorney argued that the prosecutor's failure to notify the defense of the planned testing constituted "some form of mismanagement," but conceded the prosecutor's oversight was not deliberate.

And I don't think -- again I [cannot] find any justification why this would have been done quote, deliberately. But nonetheless, and so I think it's recognized by the plaintiff that this was an oversight and clearly it damages Mr. Dunya's ability to defend this particular piece of information because the information, this sort of crime lab testimony potentially can be very impressive upon a jury.

The court ruled the authorization to conduct DNA testing did not violate due process.

> It seems to me that what we have here is not a due process violation; there is no violation of discovery. It is an issue of consumption, not obstruction that was not entirely exculpatory it was inculpatory.
>
> It seems there is no showing of bad faith. The evidence before me indicates the lab protocol was followed that we do not have a Criminal Rule 8.3 situation.
>
> Oversight does not in each and every case constitute mismanagement, and I will not in this instance craft a de facto exclusionary rule.

Dunya contends the trial court erred in finding there was "no showing of bad faith." Dunya asserts the failure to notify the defense before conducting the DNA testing and the failure to request a court order before authorizing the testing establishes bad faith. Substantial evidence supports the finding that there was no showing of bad faith and the prosecutor was merely negligent in failing to contact the defense.

State v. Copeland, 130 Wn.2d 244, 922 P.2d 1304 (1996), and Youngblood are analogous. In Copeland, an FBI[4] agent followed FBI policy and "discarded the remainder of DNA extracted from the crime sample after it was subjected to DNA testing." Copeland, 130 Wn.2d at 279. The court concluded that the discarded evidence was not material exculpatory evidence because "there was no evidence that any retest results would have been exculpatory." Copeland, 130 Wn.2d at 280. The court did not address whether the agent acted in bad faith but noted that the defendant failed to show that the policy itself constituted bad faith. Copeland, 130 Wn.2d at 280-81.

The out-of-state case Dunya relies on, Freeman v. State, 121 So.3d 888 (Miss. 2013), is distinguishable. In Freeman, the prosecutor lost key evidence that by court

---

[4] Federal Bureau of Investigation.

order the State had to preserve. Freeman, 121 So.3d at 895. The Mississippi Supreme Court concluded that the prosecutor's conduct violated due process because the State could give "no legitimate reason as to why it failed to follow the court order and preserve the video." Freeman, 121 So.3d at 896.[5]

We conclude Dunya has not shown the authorization to proceed with DNA testing and the failure to preserve potentially useful evidence violated his right to due process.

Opinion Testimony

Dunya contends improper opinion testimony about the person in the surveillance video impermissibly invaded the province of the jury and denied him a fair trial. The trial court has broad discretion to determine the admissibility of testimony. City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993).

We review decisions on the admissibility of evidence under an abuse of discretion standard. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. Magers, 164 Wn.2d at 181. A reviewing court will find an abuse of discretion only if it concludes that no reasonable person would have ruled as the trial judge did. State v. Atsbeha, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001). Even if evidence is erroneously admitted, reversal is not warranted "unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

As a general rule, no witness, lay or expert, may "testify to his opinion as to the guilt of a defendant, whether by direct statement or inference." State v. Black, 109

---

[5] Footnote omitted.

Wn.2d 336, 348, 745 P.2d 12 (1987). Such testimony has been characterized as unfairly prejudicial because it "invad[es] the exclusive province of the finder of fact." Black, 109 Wn.2d at 348. But testimony that is not a direct comment on a defendant's guilt, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony. State v. Sanders, 66 Wn. App. 380, 388, 832 P.2d 1326 (1992). Whether testimony constitutes an impermissible opinion on guilt will generally depend on the record and the circumstances of each case, including the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact. Heatley, 70 Wn. App. at 579.

Expert testimony in the form of an opinion is admissible under ER 702 if " '(1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact.' " State v. Willis, 151 Wn.2d 255, 262, 87 P.3d 1164 (2004) (quoting State v. Swan, 114 Wn.2d 613, 655, 790 P.2d 610 (1990)). Expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading. State v. Thomas, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004). "Courts generally 'interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases.' " Moore v. Hagge, 158 Wn. App. 137, 155, 241 P.3d 787 (2010) (quoting Miller v. Likins, 109 Wn. App. 140, 148, 34 P.3d 835 (2001)). We review the trial court's evaluation of a proposed expert witness's qualifications for abuse of discretion. State v. Perez, 137 Wn. App. 97, 108, 151 P.3d 249 (2007).

Before trial, the defense filed a motion in limine to exclude testimony that the person in the surveillance video was Dunya. During the pretrial hearing on the motions in limine, the defense agreed the person in the video appeared to be "about" 5 feet 10 inches tall and "appears to be darker skin," but argued it was not clear it was Dunya.

> The person depicted in the video is sort of lacking any kind of facial features. I mean, I think generically it can be described as a male about five-ten; appears to be darker skin but we can't say if it is Hispanic, African-American, Native American, East Indian; appears to be wearing gloves but you can't say for sure; appears to be holding something that is sort of similar in appearance to a gun but you can't say for sure. I mean if all there was, was just the image on the video and nothing else in the state's case, it would be near impossible to say well, that's Mr. Dunya.

The defense asked to exclude "any law enforcement or lay witness testimony as far as what this video tape depicts other than just the basics necessary for the foundation for its admissibility," but agreed the State could elicit testimony that the suspect in the videotape was "dark complexioned because that's pretty obvious." Consistent with the defense position, the court ruled that the State could present testimony that the suspect appeared to have a darker skin tone than other people observed on the video surveillance.

During trial, defense counsel objected to Detective Schwallie testifying about the skin tone of the person in the surveillance video, arguing it "falls within the subject matter of the motions in limine" and that it was "beyond the scope of this witness's expertise." After permitting defense counsel to conduct voir dire concerning the background and training of Detective Schwallie, the court overruled the objection.

21

Dunya contends the court erred in allowing Detective Schwallie to testify as an expert.[6] Dunya contends Detective Schwallie was not qualified to testify as an expert on infrared video images and reverse projection photogrammetry.

Detective Schwallie testified that he had been with the Bellingham Police Department for 20 years, he received extensive training in video analysis, forensic Photoshop, and digital and video image comparison, and he had more than 8 years of experience as a forensic video analyst for the police department. Detective Schwallie testified that his training involved looking at infrared images captured on a variety of security cameras. Detective Schwallie explained that infrared "throws out the color characteristics of an image, . . . it basically works off of the reflective material or the reflectiveness of the materials that the objects are made of." Detective Schwallie also testified that he had experience using reverse projection photogrammetry to determine the height of objects or people in a video.

Based on his training and experience, Detective Schwallie testified that the suspect in the video appeared "to have a darker skin tone" compared to others on the video, appeared to be closer to 5 feet 10 inches tall than 5 feet 4 inches, and had a build that was "more consistent with our 5-foot 10 male than with our 5-foot three or 5-foot four female." Based on his training and knowledge of how different types of objects and materials appear under infrared lighting, as well as his 20 years of professional experience with the police department, Detective Schwallie testified that the suspect appeared to be carrying a long barreled firearm.

---

[6] For the first time on appeal, Dunya contends the court erred in allowing Detective Schwallie to testify because he was not identified as an expert witness before trial as required by CrR 4.7(a)(2)(ii). Absent manifest constitutional error, we do not consider arguments raised for the first time on appeal. RAP 2.5(a)(3); State v. Powell, 166 Wn.2d 73, 84, 206 P.3d 321 (2009).

The court did not err in concluding Detective Schwallie qualified to testify as an expert witness. Detective Schwallie had specialized knowledge of infrared video, had analyzed the surveillance video using reverse projection photogrammetry, and was better able to compare the skin tone and height and build of the individuals in the video. Detective Schwallie's testimony was helpful to the jury and relevant to identifying the person in the video. Because the surveillance video was recorded in infrared mode, the color and tone of the images was distorted. As the court observed, the video images differed from "what would be seen with . . . the naked eye or some other type of footage."[7]

Detective Schwallie's testimony was neither a direct or implicit opinion of Dunya's guilt, nor was his comment that the person in the video appeared to have "a darker complexion" an impermissible appeal to racial prejudice. The record establishes defense counsel specifically agreed that Detective Schwallie could testify that the person in the video appeared "dark complexioned."

Dunya also argues the court erred in admitting still shots from the video comparing the height of two police offers to the person in the video. Dunya did not object to admission of the video still shots at trial. "[A]gain, there is no objection far as the showing of this -- these images on the screen as has previously been done, but we would like to reserve objection to what we do with the actual disk itself." Defense counsel later clarified that the concern was with jurors "maipulat[ing]" the images on the discs during deliberations. The court confirmed that it could have the parties reconvene

---

[7] The court also did not abuse its discretion in ruling Detective Schwallie was qualified to testify that the object the suspect was carrying was a long barreled firearm. See State v. Ortiz, 119 Wn.2d 294, 310, 831 P.2d 1050 (1992) ("Practical experience is sufficient to qualify a witness as an expert.").

and play the discs for the jury. Absent manifest constitutional error, we do not consider arguments raised for the first time on appeal. RAP 2.5(a)(3). An alleged evidentiary error is not of constitutional magnitude. State v. Powell, 166 Wn.2d 73, 84, 206 P.3d 321 (2009).

Firearm Enhancement

Relying on State v. Williams-Walker, 167 Wn.2d 889, 225 P.3d 913 (2010), Dunya argues the court did not have the authority to impose the firearm enhancement because the instruction for the special verdict states the jury must decide whether Dunya was "armed with a deadly weapon." Because the jury instructions complied with WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) defining a deadly weapon to include a firearm and the special verdict form specifically asks the jury to find whether Dunya was "armed with a firearm," we disagree.

We review a challenge to a jury instruction de novo, evaluating the jury instruction "in the context of the instructions as a whole." State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). " 'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.' " Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) (quoting Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)). Instructional error is harmless when, beyond a reasonable doubt, the jury verdict would have been the same absent the error. State v. Brown, 147 Wn.2d 330, 341, 58 P.3d 889 (2002).

The State charged Dunya with murder in the first degree with a firearm enhancement under RCW 9.94A.533(3)(a). The jury instructions complied with the

WPIC. Specifically, WPIC 2.07.02, defining the deadly weapon sentence enhancement for purpose of the special verdict, and WPIC 2.10, defining "firearm." 11 WPIC 2.07.02, at 48 (3d ed. 2008); 11 WPIC 2.10, at 52 (3d ed. 2008).

Jury instruction 15 states:

> For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crime charged in Count I.
>
> A pistol, revolver, or any other firearm is a deadly weapon whether loaded or unloaded.[8]

Jury instruction 16 states, "A 'firearm' is a weapon or device from which a projectile may be fired by an explosive such as gunpowder."

The note on use for WPIC 2.07.02 recommends using the instruction "in those cases in which an enhanced sentence for use of a deadly weapon is sought under . . . RCW 9.94A.533 . . . and the only weapon allegedly used by the defendant is a firearm." 11 WPIC 2.07.02 note on use at 48. The comment to WPIC 2.10 notes that the "firearm" definition applies "to firearm enhancements under RCW 9.94A.533(3)." 11 WPIC 2.10 comment at 52.

---

[8] 11 WPIC 2.07.02 states, in pertinent part:

DEADLY WEAPON—DEFINITION FOR SENTENCE ENHANCEMENT—SPECIAL VERDICT—FIREARM

For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crime [in Count ____].

. . . .

. . . .

A pistol, revolver, or any other firearm is a deadly weapon whether loaded or unloaded.

(Alteration in original.)

25

The jury found by special verdict that Dunya was "armed with a firearm" during the commission of the crime. The special verdict form states, in pertinent part:

We, the jury, return a special verdict by answering as follows:

QUESTION: Was the defendant, KEAYN DUNYA, armed with a firearm at the time of the commission of the crime of Murder in the First Degree as charged in Count I?

ANSWER: YES (Write "yes" or "no").

In Williams-Walker, the Washington State Supreme Court considered "whether a trial court may impose a firearm enhancement in the absence of a jury finding by special verdict that the defendant used a firearm." Williams-Walker, 167 Wn.2d at 898.[9] In the three consolidated cases, the trial court imposed a firearm enhancement after the jury was asked to find by special verdict whether the defendant was armed with a "deadly weapon." Williams-Walker, 167 Wn.2d at 898. Because the jury returned answers to the deadly weapon special verdict forms, the court reasoned that the jury "authorized only a deadly weapon enhancement, not the more severe firearm enhancement." Williams-Walker, 167 Wn.2d at 898. The court held that "[f]or purposes of sentence enhancement, the sentencing court is bound by special verdict findings," and that a firearm sentence enhancement "must be authorized by the jury in the form of a special verdict." Williams-Walker, 167 Wn.2d at 900.

Here, the jury found by special verdict that Dunya used a "firearm" in committing the crime. Although jury instruction 15 states that "[f]or purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon" rather than a "firearm," the instructions told the jury that a "deadly

_____

[9] Emphasis in original.

26

weapon" includes a "firearm" and further defined "firearm" in a separate instruction.[10] The instructions properly informed the jury of the applicable law and that in order to return this special verdict, it had to find beyond a reasonable doubt that Dunya committed his offense while armed with a "firearm."

We affirm.

Schindler, J.

WE CONCUR:

Spearman, C.J.

Leach, J.

---

[10] (Emphasis added.) For the first time in his reply brief, Dunya claims State v. Recuenco, 163 Wn.2d 428, 180 P.3d 1276 (2008), requires a specific pattern jury instruction to impose a firearm enhancement. We do not consider an argument made for the first time in a reply brief. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).